IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 8 2026

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

PAULA FISHER,
Plaintiff,

v.

STEWART TITLE COMPANY,
STEWART TITLE GUARANTY COMPANY,
Defendants.

Civil Action No. 1:25-cv-01001-VMC-JEM

**PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT OBJECTION
(DKT. 118) TO THE REPORT AND RECOMMENDATION (DKT. 112)
AND FOR CONSIDERATION OF
STEWART TITLE GUARANTY COMPANY'S
APRIL 21, 2026 ERRATA PRIOR TO  DE NOVO REVIEW**

Plaintiff Paula Fisher, proceeding pro se, respectfully moves for leave to

supplement her Objection (Dkt. 118) to the Report and Recommendation (Dkt.

112) as to Defendant Stewart Title Guaranty Company ("STGC"), and requests

that the Court consider this supplemental material prior to de novo review.

This motion is narrowly directed to a material **post-Objection development:**

STGC's Rule 30(b)(6) corporate witness provided sworn testimony concerning

STGC's role in Plaintiff's transaction, and STGC thereafter executed an errata sheet dated April 21, 2026 **substantively revising that testimony**. Plaintiff obtained the errata from the court-reporting service and presents it promptly so the Court may consider a **complete and accurate record** before ruling.

This development bears directly on (1) the reliability and completeness of the record under Rule 72(b), and (2) STGC's effort to frame its role as limited to an insurance policy at the Rule 12 stage. The errata supports Plaintiff's already-pending objection to dismissal with prejudice and her alternative request for limited leave to replead Counts I, II, and III, with particular emphasis on pleading **fraud-based** allegations with particularity as to Counts I and III.

Plaintiff does not shift theories; she refines the factual basis for claims already pleaded using **STGC's own discovery materials and revised sworn testimony.** The errata reflects a **revision of sworn testimony** that aligns with STGC's **current** litigation position now before the Court. The **record changed after** Plaintiff filed her Objection seeking de novo review, and the Court should evaluate the matter on a complete and current record before ruling. [1]

---

[1] Plaintiff filed her Objection on **April 10, 2026** (Dkt. 118), invoking de novo review. STGC's Rule 30(b)(6) errata was obtained by Plaintiff on **April 22, 2026.** The **revision to STGC's sworn corporate testimony** therefore occurred **after** Plaintiff's Objection and prior to the Court's ruling.

# I. THE SUPPLEMENTAL MATERIAL IS NEW AND COULD NOT HAVE BEEN PRESENTED EARLIER

STGC produced its Rule 30(b)(6) witness on **February 17, 2026.** The errata was obtained by Plaintiff on **April 22, 2026.**

This material did not exist when Plaintiff filed her Objection and is presented promptly upon receipt.

# II. THE ERRATA REVISES ACCURATE SWORN TESTIMONY

The errata does not identify any transcription error. The court-reporting service **confirmed the original transcript accurately reflects the testimony given.** [2]

The errata instead revises that accurate testimony **after the fact**, narrowing STGC's characterization of its role toward a "non-insured/no duty" framing consistent with its litigation position now before the Court.

---

[2] Plaintiff confirmed with the court-reporting service (Lexitas) that the original transcript accurately reflects the testimony as given, including review of the audio recording, and that **no transcription error was identified.**

## III. THE ORIGINAL TESTIMONY CONFIRMED A TRANSACTION-SPECIFIC APPROVAL FUNCTION

STGC's Rule 30(b)(6) testimony confirmed that, in Plaintiff's transaction:

- an over-limits request was generated through the **Virtual Underwriter workflow;** and
- STGC issued conditional underwriting approval before the transaction proceeded.

This reflects a **pre-closing,** transaction-specific **approval** function **before allowing title to transfer.** That **testimony aligns** with **STGC's own approval materials** requiring underwriting approval, tied to Virtual Underwriter **forms,** and conditioned on confirming the buyer LLC was in good standing.

Those **two versions of STGC's position** now exist side by side. At minimum, that inconsistency bears directly on the reliability and completeness of the record and precludes resolving STGC's role as a matter of law at the pleading stage.

## IV. THE REVISED TESTIMONY CONFLICTS WITH STGC'S OWN RECORD

STGC's response to the Objection advances an insurance policy-only Rule 12 framing. The errata moves the testimony in that same direction. But that narrowed position conflicts with **STGC's own** produced materials and **original sworn testimony** from February 17, 2026, which reflect a structured, mandatory approval process tied to the transaction and conditioned on confirming that the **buyer LLC**

**was in good standing in its state of incorporation** and, where required to transact business or acquire real property in Georgia, was **properly registered and approved** by the State of Georgia as a foreign entity in accordance with applicable law and Stewart's underwriting requirements.

This divergence between STGC's original testimony, revised testimony, and its litigation position demonstrates that its characterization of its role cannot be treated as fixed at the pleading stage.

## V. THE TIMING OF THE ERRATA IS MATERIAL

The transcript reflects the sworn testimony given by STGC's Corporate Representative on **February 17, 2026.** The errata is dated **April 21, 2026.** STGC filed its response on **April 24, 2026.**

Thus, STGC sought adoption of an insurance-policy-only framing **after** its corporate testimony had **been revised** in a manner aligning with that position. This timing confirms that the record is not fixed and must be considered in its full, revised context before ruling.

The significance of the errata is not that it creates a new defense. It is that the **original sworn testimony** and **the later revision now exist side by side.** That

contrast bears directly on the reliability, consistency, and weight of STGC's current characterization of its role.

Even where an errata sheet exists, the **original sworn answers do not disappear.** Here, the original testimony reflects one description of STGC's role, while the revised testimony reflects a narrower characterization consistent with STGC's litigation position. That divergence is properly considered by the Court in evaluating the record at this stage, particularly where the testimony concerns STGC's role in approving and issuing the insurance policy at issue, including a policy issued to a **non**-existent entity.

The timing further underscores the point. The transcript was from **February 17, 2026.** If that date triggered the Rule 30(e) period, the thirty-day deadline expired on **March 19, 2026**, yet the errata is dated **April 21, 2026**. Plaintiff does not ask the Court, through this motion, to adjudicate the procedural propriety of the errata. Plaintiff asks only that the Court consider the **original testimony** and the **revised testimony** together before ruling on dismissal with prejudice.

The issue is not whether errata sheets are permitted. The issue is whether dismissal with prejudice is appropriate where STGC's own Rule 30(b)(6) testimony on its role **was substantively revised after** Plaintiff filed her Objection and before de novo review.

## VI. THE ERRATA IS CONSISTENT WITH THE BROADER RECORD

The errata reflects STGC's continued effort to retrofit its sworn corporate testimony so it more cleanly supports the same narrow policy-only theory Plaintiff has already challenged. That is directly relevant to the Court's review of the Report and Recommendation because it bears on the reliability, consistency, and weight of STGC's current characterization of Plaintiff's claims.

It also bears directly on impeachment. Even where an errata sheet exists, the original **sworn** answers do not vanish. Here, the original transcript and the later revision now sit side-by-side. That contrast is proper impeachment material because it shows that STGC's corporate witness **first answered under oath** in one manner and then, months later, **revised** substantive testimony in a way that better serves STGC's litigation posture. The issue is not mere semantics. The issue is that STGC's witness testimony was later edited to make the defense cleaner.

This is not an isolated problem. It fits the broader pattern already before the Court. STGC narrows the case to an insurance-policy dispute when Plaintiff is **not suing** under policy rights. STC shifts responsibility toward STGC when underwriting, approval, or transaction-integrity functions are implicated. Elsewhere, enterprise-level functions are pushed toward Stewart Information Services Corporation when convenient. The late revision of sworn Rule 30(b)(6) testimony is another iteration

of the same shell-game dynamic: when the original sworn record is unfavorable, the position shifts again.

## VII. GOOD CAUSE EXISTS

Good cause exists because:

- the material arose after the Objection;
- Plaintiff acted promptly; and
- the material bears directly on issues subject to de novo review.

Without supplementation, the Court would evaluate STGC's position without considering its revised sworn testimony.

## VIII. DISMISSAL WITH PREJUDICE IS IMPROPER

The record now reflects:[3]

- transaction-specific approval activity;

---

[3] The errata arises from discovery conducted following this Court's Order permitting discovery to proceed and recognizing that the claims against STGC and STC are **interrelated. (Dkt. 56.)** STGC now seeks dismissal with prejudice while its **own sworn Rule 30(b)(6) record**—developed in that process—is **inconsistent** and has been **substantively revised**. Under these circumstances, the record is not fixed and **cannot support** dismissal with prejudice.

- a condition **requiring** confirmation of the buyer's **legal** existence;

- **issuance of a policy naming a non-existent entity;** and

- subsequent revision of testimony narrowing STGC's role.

This is not a case lacking facts; it is a case where the defendant's role is disputed and **evolving.**

## IX. THE ISSUE CANNOT BE RESOLVED WITHOUT FACTUAL DEVELOPMENT

STGC relies on the existence of an insurance policy to argue lack of duty. Plaintiff **does not** sue under that policy. Plaintiff challenges the **fraudulent issuance of the title insurance policy**, not any rights under it. [4]

The issue is the insurance policy itself: it was issued to a **legally non-existent entity.** If STGC relies on the policy, **it must account for how such a policy could be validly issued.** That question cannot be resolved on a Rule 12 record.

---

[4] Plaintiff **does not** sue for benefits under the insurance policy and **does not claim to be the insured.** Plaintiff **challenges** the approval and issuance of a insurance policy naming a **non-existent entity**. If STGC continues to rely on the policy to defeat Plaintiff's claims, then the threshold issue is whether a insurance policy naming a non-existent insured could have been validly **approved and issued under applicable underwriting standards, ALTA principles, and governing insurance law.**

The validity of the insurance policy—and whether it could **lawfully be issued to a non-existent entity**—is a factual issue requiring development beyond the pleading stage.

## X. THE PROPER REMEDY IS LIMITED LEAVE TO AMEND

Plaintiff does not seek to amend through briefing. Plaintiff seeks leave to amend so the operative complaint can **plead these facts with particularity.**

If STGC contends the Court cannot consider post-pleading materials to deny dismissal, those **same materials establish good cause for amendment.**

The Court should not dismiss **fraud-based claims** with prejudice while denying the opportunity to plead **facts revealed** through STGC's **own** discovery.

## XI. STGC'S RULE 12 POSITION IS INCOMPATIBLE WITH ITS REVISED SWORN RECORD

STGC asks the Court to apply a rigid "four corners of the complaint" Rule 12 framework and to disregard materials developed in discovery. At the same time, STGC's own Rule 30(b)(6) corporate testimony concerning its role in Plaintiff's transaction is not fixed. That testimony was later substantively revised through an April 21, 2026 errata in a manner that narrows STGC's role and aligns more closely with the same policy-only framing it now advances.

This creates a structural inconsistency in STGC's position. On the one hand, STGC seeks dismissal with prejudice based on a constrained pleading record. On the other hand, the only sworn corporate testimony addressing STGC's actual role in the transaction **has been altered after the fact** and now exists in competing versions.

A Rule 12 dismissal with prejudice requires a stable and reliable record. Where a defendant's own sworn corporate testimony has been materially revised to align with its litigation position—and where that testimony concerns the very scope of the defendant's role at issue—the record cannot be treated as fixed for purposes of dismissal.

Under these circumstances, the Court is not presented with a purely legal pleading deficiency. It is presented with an evolving factual record, reflected in STGC's own testimony and subsequent revisions. That condition precludes resolution of STGC's role as a matter of law at the pleading stage and independently supports denial of dismissal with prejudice or, at minimum, leave to amend.

**WHEREFORE,**

Plaintiff respectfully requests that the Court:

1.  Grant leave to supplement Plaintiff's Objection (Dkt. 118) to the Report and Recommendation (Dkt. 112);

2.  Consider the **original testimony**, the April 21, 2026 errata, and STGC's approval materials before ruling;

3.  **Decline to adopt dismissal with prejudice** as to Counts I, II, and III;

4.  Consider the errata in support of Plaintiff's already-requested alternative relief of limited leave to replead Counts I, II, and III, with particular emphasis on Counts I and III under Rule 9(b);

5.  In the alternative, deny dismissal with prejudice and permit amendment; and

6.  Grant such other relief as the Court deems just and proper.

Respectfully submitted this 25th day of April, 2026.

/s/ Paula Fisher

Paula Fisher

Plaintiff, pro se

## EXHIBITS

Exhibit 1 – STGC Rule 30(b)(6) Errata Sheet (Dated April 21, 2026)

Exhibit 2 – Relevant Original Transcript Excerpts Referenced in Errata

Exhibit 3 –Original Transcript from STGC's 30(b)6 Witness

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April, 2026, I submitted the foregoing to the Clerk of Court for filing in the United States District Court for the Northern District of Georgia. Plaintiff is proceeding pro se and is not a CM/ECF user. Service upon counsel of record will be effected through the Court's CM/ECF system upon docketing, and by U.S. Mail.

**Amanda D. Proctor**

**Dylan Magruder**

**Carlton Fields, P.A.**

1230 Peachtree Street NE, Suite 900

Atlanta, Georgia 30309

**Monica K. Gilroy**

**The Gilroy Firm**

100 North Point Center East, Suite 125

Alpharetta, Georgia 30022

/s/ Paula Fisher

Paula Fisher

Plaintiff, pro se

**Exhibit 1**

**STGC Rule 30(b)(6) Errata Sheet (Dated April 21, 2026)**

Eric Zeni
February 17, 2026

Page 197

CERTIFICATE

STATE OF __NEW YORK_____

COUNTY/~CITY~ OF __WESTCHESTER____

Before me this day personally appeared
Eric Zeni who, being duly sworn, states
that the foregoing transcript of his/her
deposition, taken in the matter, on the date
and at the time and place set out on the title
page hereof, constitutes a true and accurate
transcript of said deposition.

_____

SUBSCRIBED and SWORN to before me this

__21st_____day of __April_____2026 in the

jurisdiction aforesaid.

SVITLANA LAZARESKU
Notary Public State of New York
Registration #01LA6177626
Qualified In Putnam County
Commission Expires Aug 12, 2024

_____    _____
My Commission Expires          Notary Public

          [ ] No changes made to the Errata Sheet;
      therefore, I am returning only this signed,
      notarized certificate.

          [X] I am returning this signed, notarized
      certificate and Errata Sheet with changes
      noted.

Eric Zeni
February 17, 2026

Page 198

DEPOSITION ERRATA SHEET

Deponent: Eric Zeni

Deposition Date: 02/17/2026

To Reporter:

I have read the entire transcript of my

deposition taken in the captioned matter or

the same has been read to me.  I request that

the following changes be entered upon the

record for the reasons indicated.  I have

signed my name to the Errata Sheet and

appropriate certificate and authorize you to

attach both to the original transcript.

Page No. 20     Line No. 25

Change to: 3(a)

Reason for Change: Transcript erroneously states "three-day"

Page No. 24     Line No. 20

Change to: different.

Reason for Change: Transcript erroneously states "differing."

Page No. 83     Line No. 15

Change to: my

Reason for Change: Transcript erroneously states "refresh your

recollection" should state "refresh my recollection"

Eric Zeni
February 17, 2026

Page 199

Deposition of Eric Zeni

Page No. 88    Line No. 20

Change to: "act of the"

Reason for Change: erroneously states "actively insured" should state "act of the insured"

Page No. 168    Line No. 2

Change to: was

Reason for Change: erroneously states "this is not" should state "this was not"

Page No. 168    Line No. 8

Change to: "non-insured"

Reason for Change: erroneously states "no duty to our insured" should state "no duty to a non-insured"

Page No. 175    Line No. 15

Change to: "it"

Reason for Change: erroneously states "so is seems" should state "so it seems"

Page No. _____    Line No. _____

Change to: _____

Reason for Change: _____

Signature: _Eric Zeni_    Date: April 21, 2026
Eric Zeni

**Exhibit 2**

**Relevant Original Transcript Excerpts Referenced in Errata**

Eric Zeni
February 17, 2026

Page 20

Q      At what point must validation be completed:  Before the commitment, before closing, before the policy issuance, or after?

MS. PROCTOR:  I'm going to object to the form of the question, compound.  I'm also going to object as this being outside the scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  Validation of what?

BY MS. FISHER:

Q      Validation of the buyer.  The buyer's legally registered the foreign entity...

MS. PROCTOR:  Same objection.  If he has personal knowledge, he can answer.

THE WITNESS:  Again, I don't know.  And, as I said earlier, it -- specifically with an owner's policy, that would not necessarily be something that would be required.

BY MS. FISHER:

Q      That what would be required?  That they verify that the LLC is, in fact, valid?

MS. PROCTOR:  Object to form and scope.

THE WITNESS:  Correct.  And the reason is, when you're issuing an owner's policy, it contains an exclusion, on the policy jacket, three-day, which excludes matters from coverage that

Eric Zeni
February 17, 2026

Page 24

Q    Which was, in my case, my transaction.

MS. PROCTOR:  Object to the form.

BY MS. FISHER:

Q    So what if the third-party closing office needed the approval from Stewart Title Guaranty Company to close that transaction?

MS. PROCTOR:  Object to the form. Assumes facts not in evidence.

THE WITNESS:  In your transaction, there was an over-limits request sent, and it was sent with a conditional approval.  I'm sorry.  I should say STGC gave the conditional approval.

BY MS. FISHER:

Q    Is a certificate of existence in good standing required in every LLC transaction?

MS. PROCTOR:  Objection.  Outside the scope, and I'm going to object to the form of -- of the question.

THE WITNESS:  I can't answer that. Every transaction is differing.

BY MS. FISHER:

Q    What about my transaction?

A    I don't recall specifically.  I would need to review the over-limits approval.

Q    So you didn't review that before this

Eric Zeni
February 17, 2026

Page 83

Q    And this was before the lawsuit; correct?

A    I -- I don't recall.

Q    You don't recall the month or the date that you responded to the insurance commissioner? You don't recall if it was before the lawsuit or after I filed the Federal lawsuit?

MS. PROCTOR:  No.  You can testify regarding when you sent the DOI response, if you know.

THE WITNESS:  Regardless, I don't know when the lawsuit was filed.  I don't remember when I sent -- what the dates are on my responses to the DOI.  If you have them and want to show them to me, that would refresh your recollection.  Otherwise, the documents speak for themselves.

BY MS. FISHER:

Q    The lawsuit was filed February of 2025, and Amanda -- Ms. Proctor just said she had objected on client-attorney work product privilege, so it was prelawsuit.

MS. PROCTOR:  Is there a question, Paula?

MS. FISHER:  Yes.  The question I asked, if -- before Stewart Title Guaranty Company

Eric Zeni
February 17, 2026

Page 88

attention, that the LLC was never registered or a legal entity.  Corrective action I mean to correct the chain of title at that point.  Did you take that into consideration for that -- what corrective measures or action you could have tooken at that point, once the insurance commissioner notified you?

MS. PROCTOR:  Object to the form.  Vague.  Outside the scope of what this witness is here to testify about.  If you have a question about the specific response, please show him the document.

THE WITNESS:  My response speaks for itself.  The letter speaks for itself.  To the extent I recall it without having it in front of me, it noted you were not an insured, so STGC owed no duty to do anything.  We didn't have a claim from our insured, and I believe further noted that even if we did receive a claim from our insured regarding the formation or licensure or anything to do with the formation of the LLC, that would not be covered under the policy as an actively insured, pursuant to Exclusion 3A.

BY MS. FISHER:

Q    So, Mr. Zeni, very specifically, do you recall the two phone calls that you had at length with the insurance commissioner's office?  And those

Eric Zeni
February 17, 2026

Page 168

claim file.  It was provided from Gurvey Law Group.

This is not prior thereto in STGC's possession.

It's not something we generated or did ourselves.

And to your question about curative, I go back to

what I said earlier today.  Your claim was denied

because you're not our insured.

We don't owe any duty to you to do any

sort of curative action.  We have no duty to our

insured.  And if the grantee, the purchaser, that

received the policy was not properly formed, then

that is their fault.  And, as I said earlier several

times, that would not be covered under Exclusion 3A.

So I don't see any set of facts here

under any circumstance that STGC would owe any

reason to conduct a curative action.

**Q      You say that, even with SISCO's**

**president and CEO signing off on this policy.**

MS. PROCTOR:  Object to the form.

Assumes facts not in evidence.

MS. FISHER:  Mandy, I'm sending you the

next set of exhibits.

THE WITNESS:  Is that a question?

MS. PROCTOR:  Yes.  Do you want to

answer it, subject to my objections?

THE WITNESS:  My answer, if that was a

Eric Zeni
February 17, 2026

Page 175

BY MS. FISHER:

Q      But Stewart Title Guaranty Company possessed this packet before you wrote, in December of 2024, the letter and before your January in 2025 letter to the OCI?

MS. PROCTOR:  Object to the form. Assumes facts not in evidence.

BY MS. FISHER:

Q      If you look at -- scroll up, Bates range page 502, the United States Patriot Name Search, that does go on a preliminary title report, as such in this one that's dated September 17, it's targeting Catalyst REI.

MS. PROCTOR:  Object to the form.

THE WITNESS:  So is seems like you read everything here except where it says, "Certified to the Gurvey Law Group, PC."  This was not requested or generated by STGC.  This was in Gurvey's possession until it was turned over to STGC at some point following receipt of your claim.

This is not an STGC document.  It was received by Gurvey Law Group.  I don't know, as I said earlier, what date STGC came into possession of this.  So to your point about whether or not we had this, when I drafted my response to the department

**Exhibit 3**

**Original Transcript from STGC's 30(b)6 Witness**

Eric Zeni
February 17, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PAULA FISHER,

      Plaintiff,

vs.                                          CIVIL ACTION
                                             FILE NO.
                                             1:25-cv-01001

STEWART TITLE COMPANY,

      Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~

30(b)(6) REMOTE DEPOSITION OF

STEWART TITLE GUARANTY COMPANY

THROUGH ERIC ZENI

February 17, 2026

10:02 a.m.

(All attendees appeared remotely via

videoconferencing and/or teleconferencing.)

— — —

Kate McKee, CCR, 4791-3874-7305-1648

Eric Zeni
February 17, 2026

Page 3

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff:

Paula Fisher (Pro se)

On Behalf of Stewart Title Guaranty Company:

AMANDA D. PROCTOR, Esquire
Carlton Fields, PA
1230 Peachtree Street NE
Suite 900
Atlanta, Georgia 30309
404.815.3400
aproctor@carltonfields.com

On Behalf of Stewart Title Company:

MONICA K. GILROY, Esquire
The Gilroy Firm
100 North Point Center E
Suite 125
Alpharetta, Georgia 30022
678.280.1922
monica.gilroy@gilroyfirm.com

ALSO PRESENT:

Mark Borst, Client Representative

Eric Zeni
February 17, 2026

Page 4

INDEX TO EXAMINATION

WITNESS: ERIC ZENI

EXAMINATION                                          PAGE
By Ms. Fisher                                           5
By Ms. Proctor                                        188

INDEX TO EXHIBITS

PLAINTIFF'S DESCRIPTION                              PAGE

Exhibit 1   Plaintiff's Notice of Deposition of       6
            Stewart Title Guaranty Company Rule
            30(b)(6)

Exhibit 2   Letter from Annette Arnold to Mary      145
            Thomas, date: 12-13-2024
            (STGC_000049 to 54)

Exhibit 3   Letter to Annette Arnold from Eric      148
            Zeni, date: 12-18-2024
            (STGC_000109)

Exhibit 4   Letter to Annette Arnold from Eric      149
            Zeni, date: 01-21-2025
            (STGC_000225 to 226)

Exhibit 5   Stewart ALTA Owner's Policy of          151
            Title Insurance (07-21-2021)
            (STGC_000230)

Exhibit 6   American Land Title Association         151
            Owner's Policy of Title Insurance
            Schedule A (STGC_000094)

(continued on next page)

Eric Zeni
February 17, 2026

Page 5

| Exhibit 7 | Email thread ending with email from Paula Fisher to Marimar Soltero and Patrick Dolbier, date: 12-13-2024 at 11:15:55 a.m. (STGC_000391) | 163 |
| Exhibit 8 | Posts and listings (STGC_000574 to 594) | 163 |
| Exhibit 9 | Posts and listings (Composite Bates) | 169 |
| Exhibit 10 | Real Estate Sale Contract, date: 04-08-2024(STGC_000084) | 169 |
| Exhibit 11 | Fulton County Tax Assessor records (STGC_000563 to 564) | 170 |
| Exhibit 12 | * | |
| Exhibit 13 | Traditional Title Services letter, date: 09-19-2024, and other documents (Composite Bates) | 172 |
| Exhibit 14 | Limited Warranty Deed (STGC_000505) | 180 |
| Exhibit 15 | State of Florida letter, date: 01-21-2026 | 180 |

(Original Plaintiff's Exhibits 1 through 11 and 13

through 15 have been attached to the original

transcript.)

Page 6

Remote Deposition of Eric Zeni

February 17, 2026

(Whereupon the witness was first duly sworn.)

MS. FISHER:  This is the deposition of Mr. Zeni --

Am I saying it right, Mr. Zeni?

THE WITNESS:  That's fine, yes.

MS. FISHER:  Zeni -- Rule 30(b)(6) corporate representative for Stewart Title Guaranty Company in Fisher versus Stewart Title Guaranty Company and Stewart Title Company, Case No. 1:25-cv-1001-VMC-JEM [sic].  My name is Paula Fisher and I'm the plaintiff, and I'm taking this deposition.  Today's deposition is being taken under oath and a court reporter is recording the testimony.

ERIC ZENI,

being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. FISHER:

Q    Mr. Zeni, if you don't understand a question, please tell me and I'll go ahead and rephrase it.  If you can please wait until I finish the question before answering and please answer it

Eric Zeni
February 17, 2026

Page 7

verbally for the court reporter.

A    Okay.

Q    Can you please state your full name for the record?

A    Eric Zeni.

Q    And, Mr. Zeni, what is your current job title?

A    Associate Chief Claims Counsel for Stewart Title Guaranty Company.

Q    Can you tell me what your business address is, where you're physically located when you work day to day?

A    711 Westchester Avenue, White Plains, New York.

Q    And you're here today as Stewart Title Guaranty Company's designated corporate representative, pursuant to Federal Rules of Civil Procedure 30(b)(b); correct?

A    Yes, as to the matters outlined in my -- in our counsel's January 19, 2025, letter.

(Whereupon a document was identified as Plaintiff's Exhibit 1.)

MS. FISHER:  Ms. Proctor, can you go ahead and show him Exhibit 1, please?

MS. PROCTOR:  For the benefit of people

Eric Zeni
February 17, 2026

Page 8

on the Zoom, I'm also sharing my screen.

MS. FISHER:  Thank you so much.

MS. PROCTOR:  I'm going to move my laptop over so the witness can see it on my laptop.

BY MS. FISHER:

Q    **Mr. Zeni, you understand that Rule 30(b)(6) requires the corporation to provide a witness prepared to testify about the topics listed in the deposition notice; correct?**

MS. PROCTOR:  Object to the form.  Asks for a legal conclusion.

THE WITNESS:  Yes.

MS. FISHER:  Mandy, you sound so far away.  Could you please restate that?

MS. PROCTOR:  Sure.  I objected to the form of the question, and it calls for a legal conclusion.

BY MS. FISHER:

Q    **Okay.  I want to make it real clear. I'm not asking for any legal advice.**

MS. PROCTOR:  That wasn't the basis for my objection.  The question calls for a legal conclusion about the requirements of the Federal Rules of Civil Procedure.

MS. FISHER:  Okay.

Eric Zeni
February 17, 2026

Page 9

BY MS. FISHER:

Q    So, Mr. Zeni, any testimony you give today on the notice topics is being given on behalf of Stewart Title company; correct?

MS. PROCTOR:  Object to the form.

BY MS. FISHER:

Q    Have you had an --

A    Stewart Title --

Q    Go ahead.  I'm sorry.

A    Stewart Title Guaranty Company.

Q    You have had an opportunity to prepare to testify today on the notice topics; correct?

MS. PROCTOR:  Object to the form.

THE WITNESS:  As to the matters outlined in Counsel's January 19, 2026, letter, yes.

BY MS. FISHER:

Q    Okay.  Mr. Zeni, I want to ask you a very specific question:  When did Stewart Title Guaranty Company have first direct-hand knowledge that there was a defect in the title chain?

MS. PROCTOR:  Object to the form of the question.  Vague and ambiguous.

BY MS. FISHER:

Q    I'm not asking about when you had first-hand knowledge of the lawsuit.  I would like

Eric Zeni
February 17, 2026

Page 10

to know when Stewart Title Guaranty Company was first aware that there was a defect in the title chain?

MS. PROCTOR:  Same objection.

THE WITNESS:  I don't recall the specific date.  I believe when we received the notice of -- of claim would be the first time Stewart Title Guaranty Company became aware of any -- anything to do with this matter.

BY MS. FISHER:

Q   And what date was that around, approximately, even if you could give me the month or the month and the year?

A   I -- I don't recall.

Q   But your position is when you were first notified of a claim?

A   Correct.

Q   And that claim you're referring to is a claim that I sent in, or would that been a notification from a regulator?

A   The claim that you submitted.

Q   Okay.

MS. PROCTOR:  I'm just going to object to form of the question.  I don't believe those are mutually exclusive.

Eric Zeni
February 17, 2026

Page 11

BY MS. FISHER:

Q    Okay.  Let's cover Stewart Title Guaranty Company's underwriting procedures, their obligations, and any validation requirements for LLC purchasers.  Mr. Zeni, can you define Stewart Title Guaranty Company's role in underwriting an owner's policy when the purchaser is an LLC?

MS. PROCTOR:  Form.  I'm just going to -- form, and it's outside the scope to the extent you're asking for underwriting information beyond the title insurance policy that was issued as part of your transaction.

THE WITNESS:  Can you repeat the question, please?

BY MS. FISHER:

Q    Yes.  Can you define Stewart Title Guaranty's Company role in underwriting an owner's policy when the purchaser is an LLC?

MS. PROCTOR:  Same objection.

THE WITNESS:  So Stewart Title Guaranty Company -- and I'll either refer to it as STGC or Guaranty Company going forward.  STGC sets underwriting -- has certain underwriting guidelines that are available to policy-issuing agents.

They -- the policy-issuing agents do

Eric Zeni
February 17, 2026

Page 12

the title search per a title commitment, and then they, ultimately, issue the policy.

BY MS. FISHER:

Q    Can you define the entity validation as to STG [sic] uses that term for LLC purchases?

MS. PROCTOR:  Objection to form.

THE WITNESS:  I don't understand the question.  I'm sorry.

BY MS. FISHER:

Q    Throughout the manual, the underwriting manual.  You have the words "entity validation."  So I'm asking:  Would you define "entity validation" when the guaranty company uses that term for LLC purchasers?  Is entity validation corporation?  An LLC?  Is that what they're referring to when they refer to entity validation?

MS. PROCTOR:  Object to the form. Assumes facts not in evidence, and it's vague in its use of the term "entity validation."

THE WITNESS:  I'm not sure.

BY MS. FISHER:

Q    For an LLC purchaser, does Stewart Title Guaranty require verification of legal existence before issuing on Stewart Title Guaranty Company paper?

Eric Zeni
February 17, 2026

Page 13

MS. PROCTOR:  Objection.  It's outside the scope, to the extent you're seeking information regarding title insurance policies, other than the title insurance policy at issue and the transaction at issue here.  If he has personal knowledge, he can answer.

THE WITNESS:  Typically, no, not for an owner's policy.  That would not be required.

BY MS. FISHER:

Q    So the guaranty company underwriters, they do not require verification, just so the record's clear, of an LLC to be valid?

MS. PROCTOR:  Objection to the scope. It's way beyond the scope, and it misstates his testimony.

THE WITNESS:  What I said was that, typically, if -- if an owner's policy is being issued, that is not something that would need to be verified for the owner's policy, specifically.

BY MS. FISHER:

Q    Okay.  Understood.  For an LLC purchaser, does Stewart Title Guaranty require verification that the entity has legal capacity in the state to take title before issuing?

MS. PROCTOR:  Objection.  Outside the

Eric Zeni
February 17, 2026

Page 14

scope and vague, so I'm objecting to the form.

THE WITNESS:  Same -- same answer. Basically, if we're talking about issuing specifically an owner's policy, then -- then no.

BY MS. FISHER:

Q     For an LLC purchaser, does Stewart Title Guaranty require verification of authority of the actual signer who can bind the entity?

MS. PROCTOR:  Objection.  Outside the scope and object to form.

THE WITNESS:  For on owner's policy specifically, I don't believe so.

BY MS. FISHER:

Q     So I'm not asking specifically about an owner's policy.  I'm asking about underwriting procedures --

MS. PROCTOR:  And that's why --

BY MS. FISHER:

Q     -- Before the policy is issues.

MS. PROCTOR:  And that's why it's beyond the scope.  We're here to talk about underwriting for an owner's title policy.

MS. FISHER:  That's not what I'm suing on.  For the record, so the record is clear, I'm not suing on behalf of the title insurance policy or an

Eric Zeni
February 17, 2026

Page 15

owner's policy.

MS. PROCTOR:  You're not here to testify either, so if there's a question, I would him.  But my scope objection is noted for the record.

BY MS. FISHER:

Q    Okay.  So, Mr. Zeni, for an LLC purchaser, does Stewart Title Guaranty Company require verification of authority of the person who is able to sign on behalf of the LLC?

MS. PROCTOR:  Objection as to scope and as to form.

THE WITNESS:  I don't know.  All transactions are different.  I can't tell you. Specifically, for an owner's policy, I don't believe so.

BY MS. FISHER:

Q    Was it Stewart Title Guaranty's requirement for this transaction, my transaction, that the buyer LLC be registered and authorized to do business in the state of Georgia as a foreign entity before Stewart Title Guaranty would agree to insure the deed and allow close to proceed?

MS. PROCTOR:  Objection to the form of the question and compound and outside scope.

Eric Zeni
February 17, 2026

Page 16

THE WITNESS:  I don't recall specifically, but if there's a document that you could show me that might refresh my recollection, I could review that.

BY MS. FISHER:

Q      It would be in the policies and procedures, and it would be in the underwriting manuals that Stewart Title Guaranty Company provides to its closing offices that they contract with.

MS. PROCTOR:  I believe he's answered the question.  If there's a document that you want to show him from those sources you just mentioned, that might be helpful.

BY MS. FISHER:

Q      So you -- for the record, you don't know if it's a requirement that the buyer LLC be registered to do business in the state of Georgia as a foreign entity.  That would be no?

MS. PROCTOR:  Objection to the form of the question.  Misstates his testimony.

THE WITNESS:  That's not the same question.

MS. GILROY:  And we join in that objection for Stewart Title Company.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 17

Q    Okay.  Mr. Zeni, can you identify every step Stewart Title Guaranty Company requires, from start to finish, to validate an LLC purchaser before issuing an owner's policy or to allow closing to proceed?

MS. PROCTOR:  Objection to the form of the question.  Assumes facts not in evidence, and it's outside the scope, and to the extent it is beyond the owner's policy at issue in this transaction.  If he has personal knowledge, he can answer.

THE WITNESS:  Can you repeat the question, please?

BY MS. FISHER:

Q    Yes, sir.  Can you identify every step Stewart Title Guaranty requires, from start to finish, to validate an LLC purchaser before issuing an owner's policy or to allow closing to proceed?

A    No.  I said earlier that that would not be something that would normally be required when issuing an owner's policy.

Q    So the underwriters for Stewart Title Guaranty Company, they don't require a seller's information sheet or a buyer's information sheet --

MS. PROCTOR:  Objection.  Outside the

Eric Zeni
February 17, 2026

Page 18

scope.

BY MS. FISHER:

Q      -- In order to verify if the seller is legally able to sell and the buyer is legally able to purchase a property?

MS. PROCTOR:  Object to the form and objection to the scope.

THE WITNESS:  Can you repeat that in one sentence, please?

BY MS. FISHER:

Q      Yes.  Stewart Title Guaranty Company, for purposes of the physical underwriter, do they require a seller's information sheet and a buyer's information sheet filled out so the title underwriter can go ahead and perform diligence to see if the seller is legally able to sell the property and a buyer is legally able to take possession of that property?

MS. PROCTOR:  Objection to the form, objection as being outside the scope, and it's vague and ambiguous.

THE WITNESS:  I'm not sure what you mean by seller's information sheet or buyer's information sheet, but the due diligence and the investigation would all be something that would be

Eric Zeni
February 17, 2026

Page 19

done by the policy-issuing office, which would be here, Gurvey Law Group.

BY MS. FISHER:

**Q      So the underwriters, the physical underwriters at the guaranty company, they don't issue requirements to the closing office before closing?**

MS. PROCTOR:  Objection.  Scope and form.

THE WITNESS:  No, not -- typically no. There -- there are underwriting bulletins and guidelines available to policy-issuing offices and then they -- policy-issuing offices conduct the due diligence, the title search, and -- ultimately culminating in the issuance of the title policy.

BY MS. FISHER:

**Q      At what point must validation be completed:  before commitment, before closing, before the policy issuance, or after?**

A      I'm --

MS. PROCTOR:  I'm sorry.  I didn't hear the question.  You broke up a little bit, Paula. Can you repeat it?

MS. FISHER:  Yeah.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 20

Q    At what point must validation be completed:  Before the commitment, before closing, before the policy issuance, or after?

MS. PROCTOR:  I'm going to object to the form of the question, compound.  I'm also going to object as this being outside the scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  Validation of what?

BY MS. FISHER:

Q    Validation of the buyer.  The buyer's legally registered the foreign entity...

MS. PROCTOR:  Same objection.  If he has personal knowledge, he can answer.

THE WITNESS:  Again, I don't know. And, as I said earlier, it -- specifically with an owner's policy, that would not necessarily be something that would be required.

BY MS. FISHER:

Q    That what would be required?  That they verify that the LLC is, in fact, valid?

MS. PROCTOR:  Object to form and scope.

THE WITNESS:  Correct.  And the reason is, when you're issuing an owner's policy, it contains an exclusion, on the policy jacket, three-day, which excludes matters from coverage that

Eric Zeni
February 17, 2026

Page 21

are accepted or assumed or created by the insured. So the buyer, if it's an entity such as an LLC, would be the insured.

If the buyer did not properly register or form itself, that would be a matter created and assumed by the insured. So if it wasn't properly formed, there would never be coverage under an STGC policy.

BY MS. FISHER:

Q   Thank you, Mr. Zeni. So for an LLC validation, Stewart Title Guaranty Company does not require any records, and they're not required -- they don't -- the guaranty company doesn't need acceptable proof under Stewart Title Company Guaranty's standard?

MS. PROCTOR: Object to the form. Compound. Misstates testimony. Object to the scope because it's beyond the title policy at issue in this case. If he has any personal knowledge, he can answer.

THE WITNESS: I didn't understand the question.

BY MS. FISHER:

Q   So Stewart Title Guaranty Company -- so yes or no, Stewart Title Guaranty Company, for an

Eric Zeni
February 17, 2026

Page 22

LLC validation, the guaranty company doesn't require any record or acceptable proof under Stewart Title Guaranty Company's standards --

MS. PROCTOR: Same objection --

BY MS. FISHER:

Q    -- before closing?

MS. PROCTOR: I'm sorry, Paula. I imposed my objection too quickly. I object on the same basis, outside the scope and form. Again, any personal knowledge, he can answer.

MS. GILROY: And STC also joins in the objection.

THE WITNESS: No, that isn't what I said. Every transaction is different, so it would depend on any individual transaction. I -- I can't speculate. All I can tell you is, as I said earlier, typically, that would not be something that would be required for the issuance of an owner's policy.

BY MS. FISHER:

Q    For my -- for my transaction.

MS. PROCTOR: Object to the form.

BY MS. FISHER:

Q    Is it no, Mr. Zeni?

A    Typically, not for the issuance of an

Eric Zeni
February 17, 2026

Page 23

owner's policy.

Q      What about for the closing of the transaction?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  Stewart Title Guaranty Company is not involved in authorizing a closing. It only sets -- it -- it only -- it only has policy-issuing agents that issue policies.  So STGC is not involved with whether or not -- the settlement or closing of other transactions; only whether or not a policy can be issued in its name.

BY MS. FISHER:

Q      So there's no approval that's required before -- there's no approval that's required before an issuing agent, a third-party office, closes a transaction?  Stewart Title Guaranty Company doesn't require that?

MS. PROCTOR:  Objection.  Outside the scope and object to form.  Misstates testimony.

THE WITNESS:  Under certain circumstances, policy-issuing agents have certain thresholds where they would seek over-limits approval, prior to closing the transaction.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 24

Q    Which was, in my case, my transaction.

MS. PROCTOR:  Object to the form.

BY MS. FISHER:

Q    So what if the third-party closing office needed the approval from Stewart Title Guaranty Company to close that transaction?

MS. PROCTOR:  Object to the form. Assumes facts not in evidence.

THE WITNESS:  In your transaction, there was an over-limits request sent, and it was sent with a conditional approval.  I'm sorry.  I should say STGC gave the conditional approval.

BY MS. FISHER:

Q    Is a certificate of existence in good standing required in every LLC transaction?

MS. PROCTOR:  Objection.  Outside the scope, and I'm going to object to the form of -- of the question.

THE WITNESS:  I can't answer that. Every transaction is differing.

BY MS. FISHER:

Q    What about my transaction?

A    I don't recall specifically.  I would need to review the over-limits approval.

Q    So you didn't review that before this

Eric Zeni
February 17, 2026

Page 25

deposition today?

A    I did not --

MS. PROCTOR:  Object to the form.
Misstates his testimony.

THE WITNESS:  Not what I said.  I would
need to refresh my recollection by looking at it.
BY MS. FISHER:

Q    Did Stewart Title Guaranty Company
require an LLC to be active or in good standing at
or before closing a transaction?

MS. PROCTOR:  Object to the form.
Objection as being outside the scope.  Stewart Title
Guaranty did not close this transaction.

THE WITNESS:  Could you repeat it,
please?
BY MS. FISHER:

Q    Yes.  Did Stewart Title Guaranty
require the LLC to be active and in good standing at
or before closing the transaction?

MS. PROCTOR:  Same objections.
BY MS. FISHER:

Q    Yes or no?

A    I don't understand.  Is this a general
question, or are we talking about this specific
transaction?

Eric Zeni
February 17, 2026

Q    We're talking general question, in Stewart Title Guaranty Title Company's policy.

MS. PROCTOR:  And it's just a scope objection and form, so, if he has any personal knowledge, he can answer.

THE WITNESS:  I don't know.  Every transaction is different.

BY MS. FISHER:

Q    Does Stewart Title Guaranty Company require the deed-granting name to exactly match the validated entity name?  For an example, including the suffix like "LLC" versus "incorporated"?

MS. PROCTOR:  I'm going to object.  This is way outside the scope.  Stewart Title Guaranty is not the closing agent here.  He's here to talk about the underwriting of the title policy.  So he -- if he has any personal knowledge, he can answer, but I'm raising a scope and a form objection.

THE WITNESS:  I don't know.

MS. FISHER:  Ms. Proctor, you keep saying it's outside of the scope.  So would this be something that SISCO would produce these manuals?

MS. PROCTOR:  I'm not here to testify, Paula.  I'm here to lodge my objections and preserve

Eric Zeni
February 17, 2026

Page 27

them for the record.

MS. FISHER:  Okay.

MS. PROCTOR:  But we -- for the topics, as set forth in my January 19 letter, we're putting -- we have prepared Mr. Zeni to testify regarding underwriting of the title policy at issue and the transaction that underlies your complaint. There's a continuing confusion as to closing duties and title policy underwriting duties.  Stewart Title Guaranty is the title insurance -- is on the underwriting side.  It's not the closing agent.

So that's why I'm objecting to it being outside the scope.  It's not a SISCO issue.  It's a, are we talking about closing duties, or are we talking about underwriting duties?  And that's the basis for my scope objection.

MS. FISHER:  Okay.

BY MS. FISHER:

Q    If there's a mismatched LLC versus incorporation, is that treated as a defect that must be resolved before closing the transaction?

MS. PROCTOR:  Again, scope, to the extent you're seeking information regarding closing, and form.  If he has any personal knowledge, he can answer.

Eric Zeni
February 17, 2026

Page 28

THE WITNESS:  I don't understand the question.

BY MS. FISHER:

Q    Mr. Zeni, where are Stewart Title Company's LLC validation requirements memorialized?

MS. PROCTOR:  Objection.  Scope and form.

THE WITNESS:  I -- I don't know specifically.  I don't recall.

BY MS. FISHER:

Q    So you don't recall the underwriting manuals?

MS. PROCTOR:  Objection.  Misstates testimony and form.

BY MS. FISHER:

Q    The underwriting bulletins, the agent instructions that Stewart Title Guaranty puts out when they contract with a closing office, the training materials, the system processing --

MS. PROCTOR:  Is it frozen for everybody?

BY MS. FISHER:

Q    -- and work flows?

MS. PROCTOR:  So I think we froze.  We did not hear the question, but I think everybody

Eric Zeni
February 17, 2026

Page 29

froze on our end.

BY MS. FISHER:

Q     Okay.  Let me repeat that.  You're saying you don't recall where Stewart Title Guaranty Company's LLC validation requirements are memorialized?

MS. PROCTOR:  Form.

THE WITNESS:  No.  Stewart -- STGC has underwriting materials made available to its policy-issuing agents.

BY MS. FISHER:

Q     The underwriting manuals, the agent instructions, the training materials, the system work flows, those are provided to the offices you contract with; correct?

MS. PROCTOR:  Objection to the form. Vague and ambiguous in its use of terms like "work flow systems."

THE WITNESS:  I do not now what you mean by work flows -- system work flow, but there are underwriting bulletins, underwriting guidelines that are available to policy-issuing offices.

BY MS. FISHER:

Q     Are the offices that Stewart Title Guaranty Company contract with, are they able to

Eric Zeni
February 17, 2026

talk with live underwriters?

MS. PROCTOR:  Objection to the form and scope.

THE WITNESS:  I believe so, yes.

BY MS. FISHER:

Q      Can you identify the titles or names of the documents, modules that contain the LLC validation requirements within that system --

MS. PROCTOR:  Objection to --

BY MS. FISHER:

Q      -- Virtual Underwriter?

MS. PROCTOR:  Objection to form and scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  No.  Just -- no, I don't.  I don't recall.

BY MS. FISHER:

Q      Are there any checklists or forms Stewart Title Guaranty Company requires for entity validation that are within the Virtual Underwriting system?

MS. PROCTOR:  Object to the form and scope.

THE WITNESS:  I don't recall.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 31

Q    Do the Stewart Title Guaranty systems capture a field, a check box showing entity verified?

MS. PROCTOR:  Objection to form. Outside the scope.

THE WITNESS:  Yeah.  I -- I don't understand that question.

BY MS. FISHER:

Q    In the Virtual Underwriting system, is there a field or a check box that needs to be checked showing that the entity was verified, an LLC or incorporation, showing that that step has been completed before closing?

MS. PROCTOR:  Object to form.  Outside the scope.

THE WITNESS:  I'm not aware of that. Virtual Underwriter just has underwriting manuals, underwriting guidelines.  It's not something that is specific to an individual transaction.

BY MS. FISHER:

Q    So Virtual Underwriter more assists the closing agents?

MS. PROCTOR:  Form.  Outside the scope.

THE WITNESS:  I don't know what you mean by "assist."  It's just a compilation of

Eric Zeni
February 17, 2026

Page 32

underwriting bulletins.

BY MS. FISHER:

Q    So you're familiar with those underwriting bulletins?

MS. PROCTOR:  Form.  Scope.

THE WITNESS:  I know that Virtual Underwriter contains underwriting guidelines, underwriter bulletins, and the like.

BY MS. FISHER:

Q    Does Stewart Title Guaranty Company maintain an audit trail showing who verified the entity and when?

MS. PROCTOR:  Form, scope, vague in its use of the trail.

THE WITNESS:  I don't know what you mean by audit trail, and I -- I don't know.

BY MS. FISHER:

Q    Does Stewart Title Guaranty expect issuing agents to follow their underwriting requirements when issuing a policy on Stewart Title Guaranty paper?

MS. PROCTOR:  Scope.

THE WITNESS:  Yes.  We would hope policy-issuing agents would follow underwriting guidelines.

Eric Zeni
February 17, 2026

Page 33

BY MS. FISHER:

Q     Does Stewart Title Guaranty have authority to refuse issuance, if required validation steps are not satisfied?

MS. PROCTOR:  Objection.  Form, scope.

THE WITNESS:  No.  Policy-issuing agents are authorized to issue policies in Stewart's name.  They are supposed to follow underwriting guidelines, but they're -- they conduct the closings and issue policies in Stewart's name.  Stewart isn't there to stop anything.  They're not present at the closing.  STGC is not.

BY MS. FISHER:

Q     So if an issuing agent didn't follow proper underwriting protocol, they could still issue a policy on behalf of the Stewart Title Guaranty Company?

MS. PROCTOR:  Objection to the form, scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  If they're a validly appointed policy or issuing agent, yes, they could issue a policy in STGC's name.

BY MS. FISHER:

Q     Does Stewart Title Guaranty audit or

Eric Zeni
February 17, 2026

Page 34

quality control issuing agent compliance with underwriting requirements?

MS. PROCTOR:  Objection to the form. Vague.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    How often are agents audited for underwriting compliance?

MS. PROCTOR:  Objection to the form. Way outside the scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    What happens when an agent issues, on Stewart Title Guaranty paper, without satisfying LLC validation requirements?  Are there any remediation steps?  Retraining?  Termination of contracts?

MS. PROCTOR:  Objection to the form of the question.  Way outside the scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Is there an escalation protocol when an LLC purchaser can't be validated or presents entity status irregularities?

Eric Zeni
February 17, 2026

Page 35

MS. PROCTOR:  Objection to form. Vague.
Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    The following questions, Mr. Zeni, you can just answer yes or no to.  It's regarding underwriting.  If an LLC is not legally valid, can it take title?

MS. PROCTOR:  Object to the form. Vague, calls for a legal conclusion, and it's outside the scope.

MS. FISHER:  I'm not asking for legal conclusions.  I'm asking for a Stewart Title Guaranty Company's underwriting standards and procedures.

MS. PROCTOR:  Your question was whether or not the LLC could legally a take title.  That's a legal conclusion.  This witness is not here to testify about that.  So it's a legal conclusion, and it's outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    If an issuing agent issued a policy to an LLC that was not legally valid, would that violate Stewart Title Guaranty's underwriting

Eric Zeni
February 17, 2026

Page 36

requirements?

MS. PROCTOR:  Object to the form.
Incomplete hypothetical.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     For the record, Mr. Zeni, I was asking about Stewart Title Guaranty Company's underwriting acceptability and internal requirements, not law, not state law.  For Stewart Title Guaranty Company to ensure a transaction involving an LLC purchaser, where should proof of an LLC validation be located?  Would that be in the closing file?  The underwriting file?  A system checklist?

MS. PROCTOR:  Kate, can you please read back the question?

MS. FISHER:  Yes, ma'am.

BY MS. FISHER:

Q     For Stewart Title --

MS. PROCTOR:  No.  I asked -- Paula, I asked the court reporter to read it back.

(Whereupon the record was read by the court reporter.)

MS. PROCTOR:  Thank you, Kate.

I'm going to object to form of the question and its use of the vague term ensure a

Eric Zeni
February 17, 2026

Page 37

transaction.  It's also compound, but -- and it's

outside the scope.  But if he has any knowledge,

personal knowledge, he can answer.

THE WITNESS:  I don't and just it

basically ignores everything I said earlier, that

you're -- you're talking about insuring an LLC

purchaser.  That would be the -- the LLC would be

the insured, so that would not typically be a

requirement for an owner -- issuance of an owner's

policy.

BY MS. FISHER:

Q   **So you would not expect to see, in the**

**underwriting issuance file, a demonstration or a**

**request for LLC validation?**

MS. PROCTOR:  Object to the form.

Scope.

THE WITNESS:  Are we talking about an

owner's policy like you said in your last question?

BY MS. FISHER:

Q   **Yes, sir.**

A   Then I don't believe so, for the

reasons I said earlier.  An owner LLC purchaser, if

that is who we issued an owner's policy to, it would

not typically be required -- a requirement for that

verification because, if the LLC is not properly

Eric Zeni
February 17, 2026

Page 38

formed, that would be something that would be an act of the insured.  The LLC itself is not properly formed, so that would be outside the scope of coverage.  It would be excluded for coverage under Exclusion 3A.

THE WITNESS:  Can we take a break soon, please?

MS. PROCTOR:  Paula, can we take a break?

MS. FISHER:  Yeah.  How long?  Five minutes?

MS. PROCTOR:  That should work.

MS. FISHER:  Okay.  Perfect.

(Proceedings in recess from 10:48 a.m. to 10:57 a.m.)

MS. FISHER:  We are back on the record at 10:57 a.m. Eastern Standard Time.

Ms. Proctor, could you tell me -- Mark Borst is attending this deposition.  Can you tell me in what capacity his attendance is?

MS. PROCTOR:  He is my client representative.

MS. FISHER:  So he's here in a spectator role, not in active participation?

MS. PROCTOR:  I'm not sure.  He's just

Eric Zeni
February 17, 2026

Page 39

here to observe.  That's all.  I mean, he's not going to lodge any objections or anything along those lines.  That's my job.

MS. FISHER:  Okay.  So Mark Borst, so the record is clear, he's just here to observe?

MS. PROCTOR:  Correct.  As a client representative, he has a right to be present in a deposition.

MS. FISHER:  Perfect.  Thank you for clarifying that.

BY MS. FISHER:

Q    Mr. Zeni, under Stewart Title Guaranty underwriting and compliance procedures, if Stewart Title Guaranty later learns of a title defect, a closing occurred, and a policy was issued with an LLC validation defect, is there a standard escalation or remediation process within the Stewart families?

MS. PROCTOR:  Object to the form. Vague.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Can you define buyer entity verification Stewart Title Company -- Stewart Title Guaranty Company uses?

Eric Zeni
February 17, 2026

Page 40

MS. PROCTOR: Object to the form. Outside scope. If he has any personal knowledge, he can answer.

THE WITNESS: I don't know what you mean, how you're defining buyer identity verification, but it's not something STGC would do. STGC, as I said earlier, is not conducting the closings itself. The policy-issuing office is conducting the closing. STGC is not involved in any due diligence or the investigation or title searching or any of that sort of thing. The policy-issuing office does the due diligence and issues a policy in STGC's name.

BY MS. FISHER:

Q    Okay. So just to be clear, we're not talking about the closing office. This next set of questions I'm going to ask you, this is directly coming from Virtual Underwriter's manuals. This has nothing to do with any closing office.

In several places in the Virtual Underwriter policies and procedures underwriting manual that the closing offices use, could you define the buyer entity verification? Stewart Title Guaranty Company uses that term in several places in their manual that they produce to the closing

Eric Zeni
February 17, 2026

Page 41

offices.

MS. PROCTOR:  It would be helpful, Paula, if you would show him the documents you're referring to in these questions so that he can answer them.  But I am going to object to the form and the scope of this question.  If he has any personal knowledge, he can answer.

MS. FISHER:  It was listed as Topic 2 in the 30(b)(6) deposition notice, "All policies, procedures, systems, or manuals relating to buyer entity verification, fraud detection, and due diligence for the title insurance underwriting."

BY MS. FISHER:

Q     **Did you not prepare for that section, Mr. Zeni?**

MS. PROCTOR:  Object to the form.  And so that the record is complete, my letter to you January 19, 2026, objects to the scope of the topic and said STGC will, however, make available a corporate representative who can testify regarding the underwriting process for the title insurance policy that is the subject of this litigation.

There's been no evidence that Virtual Underwriter was used at any point during the underwriting of this title policy.  So the record is

Eric Zeni
February 17, 2026

Page 42

complete, I did not receive a response to this letter.

MS. FISHER:  So, Ms. Proctor, can you repeat what you said about Virtual Underwriter, that last statement you made?

MS. PROCTOR:  There's been no evidence that Virtual Underwriter was used in the underwriting of the title of insurance policy so far in discovery.

BY MS. FISHER:

Q     Did you review, Mr. Zeni, the deposition from Stewart Title Company's 30(b)(6) witness Sean O'Callaghan in preparation of today's deposition?

A     No, I did not.

Q     Okay.  In that deposition, Sean O'Callaghan stated that Virtual Underwriter was used in my transaction.

MS. PROCTOR:  Object to the form.

MS. GILROY:  Object to form.

MS. PROCTOR:  Misstates the testimony.

BY MS. FISHER:

Q     Can you identify every Stewart Title Guaranty Company manual policy standard operating procedure, bulletin, or guideline that governs buyer

Eric Zeni
February 17, 2026

Page 43

entity verification?

                MS. PROCTOR:  Object to the form.
Outside the scope.

                THE WITNESS:  I don't know.
BY MS. FISHER:

        Q     Can you identify every Stewart Title
Guaranty Company manual, policy, standard operating
procedure, bulletin, or guideline that governs fraud
detection and underwriting?

                MS. PROCTOR:  Object to the form.
Outside the scope.

                THE WITNESS:  I don't know.
BY MS. FISHER:

        Q     Can you identify every Stewart Title
Guaranty Company manual, policy, standard operating
procedure, bulletin, or guideline that governs fraud
detection in underwriting?

                MS. PROCTOR:  Object to the form.
Outside the scope.

                THE WITNESS:  I don't know.
BY MS. FISHER:

        Q     Can you identify every Stewart Title
Guaranty manual, policy, standard operating
procedure, or guideline that governs due diligence
in underwriting?

Eric Zeni
February 17, 2026

Page 44

MS. PROCTOR:  Object to the form.
Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Are these -- are any of these
requirements I'm asking about consolidated in one
underwriting manual, or are they spread across
bulletins in training?

MS. PROCTOR:  Object to the form.
Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Mr. Zeni, can you identify every system
or platform Stewart Title Guaranty Company uses to
collect the buyer entity information?

MS. PROCTOR:  Objection.  Outside the
scope and object to the form.

THE WITNESS:  No, I don't know, and I
would just repeat my earlier testimony.  STGC is not
conducting closings or performing due diligence.
That's carried out by the policy-issuing office
itself.

BY MS. FISHER:

Q    So there's no system that flags any
fraud risk?

Eric Zeni
February 17, 2026

Page 45

MS. PROCTOR:  Object to the form and the scope and misstates testimony.

THE WITNESS:  Again, I'm not aware of anything.  Like I said already several times, STGC isn't doing due diligence for a specific closing. That's done by the policy-issuing agent itself.

BY MS. FISHER:

Q    So who would be the proper entity to talk to about the Virtual Underwriting system?

MS. PROCTOR:  Object to the form. Outside the scope.

MS. GILROY:  We join.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Can you tell me who owns the Virtual Underwriting system?

A    I don't know.

MS. PROCTOR:  Object to the form and outside scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Do you know of any system within the Stewart enterprise that blocks issuance to proceed with transferring title or require escalation of key due diligence fields are missing?

Eric Zeni
February 17, 2026

Page 46

MS. PROCTOR:  Object to the form.  Way outside scope and vague.

THE WITNESS:  I don't understand the question.

BY MS. FISHER:

Q     So in the underwriting process with the Stewart Title Guaranty Company underwriters, when forms are submitted to those underwriters, is there any system that flags and blocks issuance to proceed with the transferring of title or certain requirements?

MS. PROCTOR:  Object to the form and vague.  And we're getting into closing functions, so it's also outside the scope, to the extent you're asking about closing functions or other transactions other than the transaction at issue in this case.

THE WITNESS:  I still don't understand the question.  In fact, it's even worse.  What -- I don't know what you mean "other requirements" and trails off at the end.  I...

BY MS. FISHER:

Q     Does Stewart Title Guaranty Company -- do they employ actual, physical underwriters?

MS. PROCTOR:  Objection.  Outside the scope.

Eric Zeni
February 17, 2026

Page 47

BY MS. FISHER:

Q    They do?  What are the jobs of those underwriters?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  They preform underwriting duties.  They set underwriting policies.

BY MS. FISHER:

Q    Do they communicate with the closers who actually close the files?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  Define closers.

BY MS. FISHER:

Q    The closing agent, an escrow officer, a closer attorney, do they interact by phone?  Do they interact by email?  Do they have the ability to interact with the closer?

MS. PROCTOR:  Objection to the form. Compound and way outside the scope.

THE WITNESS:  I don't know about escrow officers.  I don't believe so.  I forget what else you mentioned, but, specifically, with respect to a policy-issuing office, I -- I know they that interact for over-limits approvals.

Eric Zeni
February 17, 2026

Page 48

BY MS. FISHER:

Q    And would they request certain requirements before they allowed a closing to proceed or a policy to be issued?

MS. PROCTOR:  Objection to the form. Objection to the scope.  We're getting into closing duties, not title policy underwriting duties, and so, yeah.  He -- if he has any personal knowledge...

THE WITNESS:  I'm not aware.  All I know is they can set a -- they can issue an approval, a conditional approval, like they did in this transaction.

BY MS. FISHER:

Q    But you're not aware if the underwriter can issue a set of stipulations before the policy or the closing can occur?

MS. PROCTOR:  Objection to form. Outside the scope.

THE WITNESS:  No.  I'm only aware of listing conditions within over-limits approval, conditional approval.

BY MS. FISHER:

Q    Is there is a written requirement in the underwriting guidelines that -- that the name of the grantee on the deed match the verified entity

Eric Zeni
February 17, 2026

Page 49

name?

          MS. PROCTOR:  Object to the form.
Outside the scope to the extent it concerns other
transactions or closing duties in connection with
this transaction.  If he has any personal knowledge,
he can answer.

          THE WITNESS:  I don't know.
BY MS. FISHER:

     Q     If there's a mismatch, does Stewart
Title Guaranty polices require escalation or
correction before issuance?

          MS. PROCTOR:  Form.  Scope.

          THE WITNESS:  I don't know.
BY MS. FISHER:

     Q     Are you aware of any fraud, red flags
used in the underwriting process by your actual,
physical underwriters?

          MS. PROCTOR:  Object to the form.
Outside the scope.

          THE WITNESS:  Not sure.  I don't know.
I'm not sure I even understand the question.
BY MS. FISHER:

     Q     Does Stewart Title Guaranty Company
maintain a fraud tip sheet, a training module, or a
red flag matrix within their systems?

Eric Zeni
February 17, 2026

Page 50

MS. PROCTOR: Object to the form. Way outside the scope. If he has any personal knowledge, he can answer.

THE WITNESS: I don't know.

BY MS. FISHER:

Q    Are escalations documented in a system note or the work flow steps of the underwriter between the closer and the underwriter?

MS. PROCTOR: Object to the form. Vague. Outside scope.

THE WITNESS: I don't know.

BY MS. FISHER:

Q    Does each file that Stewart Title Guaranty Company underwrites, are they assigned an underwriter for that file?

MS. PROCTOR: Object to the form. Outside the scope.

THE WITNESS: I don't know.

BY MS. FISHER:

Q    Does Stewart Title Guaranty Company have any written policy that says, specifically, fraud has not been established?

MS. PROCTOR: Object to the form. Outside the scope. If you're reading from something, Paula, it might be helpful to show the

Eric Zeni
February 17, 2026

Page 51

witness.  Otherwise, if he has personal knowledge, he can answer.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    This would specifically be in the underwriting manuals, the title policy.  Does the guaranty company have any written policy anywhere that says that fraud has not been established that can be stated without completing a defined verification step?

MS. PROCTOR:  Same objections.

THE WITNESS:  I don't understand the question.

BY MS. FISHER:

Q    So for instance, Mr. Zeni, before you tell a regulator, a Federal regulator or a state regulator, that fraud has not been established, do you have a written rule requiring you to actually investigate first?

MS. PROCTOR:  Object to the form.  Outside the scope.  I -- you know, 30(b)(6) depositions aren't supposed to be a memory test of every policy the company has.  If there's a specific document that you're referring to, Paula, it would really be helpful for you to show the witness.

Eric Zeni
February 17, 2026

Page 52

So I'm just going to maintain my objection for the record. If he has any personal knowledge or understands your question, he can answer.

THE WITNESS: I don't.

BY MS. FISHER:

Q So you don't -- for the record, you don't know if you have a policy that allows that?

MS. PROCTOR: Object to the form. Vague, ambiguous, and outside the scope.

BY MS. FISHER:

Q So, Mr. Zeni, no verification steps --

MS. PROCTOR: Well, you have to let him answer, Paula.

MS. FISHER: Pardon me?

THE WITNESS: Yeah. I'm not aware of a specific document that you're referring to.

BY MS. FISHER:

Q For the record, I'm not asking for a legal conclusion, and I'm not asking for attorney advice. I'm specifically asking, Mr. Zeni, about Stewart Title Guaranty Company's standard procedures and whether Stewart Title Guaranty Company has written verification steps it follows before making a statement like fraud has not been established to a

Eric Zeni
February 17, 2026

Page 53

regulator.

MS. PROCTOR:  Object to the form.
Vague, ambiguous, and outside the scope.

BY MS. FISHER:

Q    Mr. Zeni, you can answer yes or no as
to whether [audio distortion] procedures exist.

A    I -- I really, really do not understand
the question.  I'm not sure what you're referring
to.

Q    I am simply asking if Stewart Title
Guaranty Company -- your position, you're in claims
counsel litigation; correct?

MS. PROCTOR:  Object to the form.
Misstates his testimony.

THE WITNESS:  I'm in the claims
department.

BY MS. FISHER:

Q    In the capacity of litigation counsel,
Mr. Zeni?

A    No.  I'm the associate chief claims
counsel.

Q    So I'm simply asking if there's any
procedure that Stewart Title Guaranty Company has
before making any kind of statements that fraud has
not been established, do you check on issues or

Eric Zeni
February 17, 2026

Page 54

complaints before issuing any kind of statement or determination or conclusion that fraud has not been established?

MS. PROCTOR:  Object to the form. Outside the scope.  This has nothing to do with the transaction.  To the extent you're reading from a document I would ask that you provide that as an exhibit for the witness to look at.

THE WITNESS:  Again, I -- I'm not following.  I don't -- I'm not aware of such -- when such a statement would be made.  Are we talking about at a closing, or are we talking about after receiving a claim?

BY MS. FISHER:

Q    I'm talking about in general, after the fact, if fraud has occurred.  If Stewart Title Guaranty Company is aware of such fraud, do you have -- does Stewart Title Guaranty Company have procedures in place that they have to verify accuracy before determining or making statements that fraud has not been established.  Do you investigate that?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  All I know is if we

Eric Zeni
February 17, 2026

Page 55

receive a -- a claim, we investigate a claim and look into that.  That's the only thing I'm aware of.

BY MS. FISHER:

Q    So for the record, could you safely say that Stewart Title Guaranty Company does not have a policy or procedure in place to investigate fraud after the fact?  Is that safe to say, Mr. Zeni?

MS. PROCTOR:  Object to the form. Vague in its use of "after the fact."  It also misstates his testimony.  It is also outside the scope.

THE WITNESS:  We're a title company. We get claims, we investigate them, and we come to a coverage determination.  If we receive a complaint from the regulator following a claim, we look into it, and we respond.  That's the only way I know how to answer your question.

BY MS. FISHER:

Q    Okay.  Perfect.  So you look into it?

MS. PROCTOR:  Object to the form. Outside scope.

THE WITNESS:  If we receive a complaint from the regulator, we review it, and we respond to it.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 56

Q    But before -- I want to be very clear for the record.  Before you respond to it, you investigate it, correct, for accuracy?

MS. PROCTOR:  Form.  Scope.

THE WITNESS:  We review a complaint received, and then we respond to it.

BY MS. FISHER:

Q    Can you tell me if Stewart Title Guaranty Company does any training on underwriting and issuing agents before they contract with the closing office?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Are the Stewart Title Guaranty Company underwriters tested, certified, or required to acknowledge policies in writing?

MS. PROCTOR:  Object to the form.  It's vague in your use of "underwriters."  Are you referring to in-house underwriters or policy-issuing agents?

MS. FISHER:  I'm referring to Stewart Title Guaranty Company's underwriters.

THE WITNESS:  In-house underwriters or

Eric Zeni
February 17, 2026

Page 57

policy-issuing agents?

MS. FISHER:  The only underwriters that exist are the in-house underwriters.

MS. PROCTOR:  Okay.  So I'm going to object to it being out the scope and being vague.

But you can answer, if you have personal knowledge.

THE WITNESS:  I don't.

BY MS. FISHER:

Q    Are issuing agents considered underwriters?

MS. PROCTOR:  Object to the form.

THE WITNESS:  Issuing agents would be policy issuing offices.

BY MS. FISHER:

Q    When I asked my prior question, Ms. Proctor had said underwriters in-house or at the issuing agent, so that's why I'm asking.  Are the issuing office considered underwriters?

A    The issuing office is the issuing office.  It would be an entity, but they might employ an underwriter.

Q    They might employ an underwriter.  An underwriter from Stewart Title Guaranty Company?

MS. PROCTOR:  Object to the form.

Eric Zeni
February 17, 2026

Page 58

Outside the scope.

THE WITNESS:  No.  They're on staff.

BY MS. FISHER:

Q     Does Stewart Title Guaranty Company audit compliance with buyer entity verification policies?

MS. PROCTOR:  Object to the form. Vague.  Outside the scope?

THE WITNESS:  Still answer?  I don't know.

BY MS. FISHER:

Q     Does STC -- does Stewart Title Guaranty audit compliance with fraud detection due diligence documentation?

MS. PROCTOR:  Object to the form. Vague.  Asked and answered.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     Mr. Zeni, can you tell me what would trigger an audit?

A     I don't know.

Q     Do you know what would happen if an audit finds noncompliance?

MS. PROCTOR:  Object to the form. Vague and overbroad.  Outside that scope.

Eric Zeni
February 17, 2026

Page 59

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Where does Stewart Title Guaranty Company retain their policies, manuals, their system documentation?

MS. PROCTOR:  Object to the form. Unlimited in subject matter.  Outside the scope.

THE WITNESS:  You're referring to underwriting materials?  Manuals?

BY MS. FISHER:

Q    Yeah, Sharepoint, the policy repositories, the underwriting portal.

MS. PROCTOR:  Object to the form and the use of the term "underwriting portal."  Outside the scope.

THE WITNESS:  I don't know about an underwriting portal.  Underwriting bulletins and alerts, like I said, are available to agents through Virtual Underwriting -- Underwriter website.

BY MS. FISHER:

Q    Do you know what the guaranty company's retention policy is for underwriting notes, the system logs, and due diligence records?

MS. PROCTOR:  I'm going to object to this being outside the scope.  He can testify

Eric Zeni
February 17, 2026

Page 60

regarding retention of the underwriting documents at issue for this transaction.

THE WITNESS:  Generally, I don't know the underwriting documents for this transaction from STGC.  The over-limits materials are -- are not set to be destroyed or anything like that.  They're just being retained.

BY MS. FISHER:

Q    Are the system audit logs preserved long enough to reconstruct who entered the buyer entity information?

MS. PROCTOR:  Object to the form. Vague in the use of audits.  What was the word you used, Paula?  Audit systems?

MS. FISHER:  The audit logs.

MS. PROCTOR:  The audit logs, yes, vague and --

MS. FISHER:  So the underwriter -- meaning the underwriter, the underwriter who inputted my name to run if I had capacity to sell the property, legal capacity, that is, and then the underwriter who entered in the buyer entity information.

MS. PROCTOR:  I'm going to object to form because audit logs is vague.  And I'm going to

Eric Zeni
February 17, 2026

Page 61

object to it being outside the scope because we're getting into closing duties, not policy underwriting duties.  If he has any personal knowledge, he can answer.

THE WITNESS:  Yeah I'm not aware of that.  I don't know what you mean by audit log, but any sort of due diligence would have been done by Gurvey Law Group, not STGC.  So they would have whatever records they might have related to that.  They would be retaining that, not STGC.

BY MS. FISHER:

Q   So Stewart Title Guaranty Company wouldn't require any kind of validation that the buyer was legally formed and able to legally purchase property.  That -- what I'm hearing -- gathering from you is that is not a requirement of Stewart Title Guaranty Company.  It's a requirement of the Gurvey Law Group?

MS. PROCTOR:  Object to the form. Misstates his testimony.

THE WITNESS:  I don't know that you're gathering anything from me.  What I told you directly earlier was that policy-issue agent, Gurvey Law Group, does the due diligence.  Stewart Title Guaranty company approved an over-limits request,

Eric Zeni
February 17, 2026

Page 62

conditionally approved it.  But, typically, for an owner's policy, a buyer -- the purchaser formation, the verification of an entity purchaser that would become our insured would not typically be required, under an owner's policy, because if that entity was not properly formed, that would be a matter that would have been a result of the insured purchaser -- the insured entity's own actions.  So that would excluded from coverage under an owner's policy.

So any sort of verification like that would not typically be required by STGC prior to issuing an owners's policy to an entity.

BY MS. FISHER:

Q     How would it be -- could you elaborate a little more on how would it be excluded then from the issuance of an owner's policy?

MS. PROCTOR:  Object to the form.

THE WITNESS:  I said if an LLC was not properly formed, it would be excluded from coverage. If we received the claim from an insured LLC purchaser about it wasn't properly formed or someone was claiming it wasn't properly formed or someone was suing the insured LLC purchaser alleging it was not properly formed, that claim would be excluded from coverage under Exclusion 3A, which excludes

Eric Zeni
February 17, 2026

Page 63

matters that are created, suffered, or agreed to by the insured.

So if an insured LLC purchaser isn't properly formed and they submit a claim to STGC, it would be outside the scope of coverage because they didn't properly form themselves or whatever requirements they didn't -- they allegedly failed to meet. That would be their responsibility to meet those requirements. And, if they failed to do so, it would be an act of the insured and put them outside of coverage, under Exclusion 3A, so they would have no claim.

BY MS. FISHER:

Q   Thank you. Now let's talk about all information, the communication, the data received from Stewart Title company relating to myself, the plaintiff; my property, 305 Eagles Pass; the title search; and the purchaser LLC. To be clear, I'm not asking substance, only what systems, materials, custodians were used to prepare?

MS. PROCTOR: Which topic are we on, Paula? I'm sorry if I missed it.

MS. FISHER: No. 3.

BY MS. FISHER:

Q   Mr. Zeni, can you identify each method

Eric Zeni
February 17, 2026

Page 64

by which STC transmits information and data to the guaranty company?

MS. PROCTOR: I'm going to object to the extent that you're getting into information or seeking testimony that's protected by the work product privilege, the common interest, and attorney-client privileges and that would relate to any transfer of information after you filed this request. If he has any information -- go ahead, Monica.

MS. GILROY: No, no, finish. I'm sorry.

MS. PROCTOR: And -- so he's here and he can testify regarding the transmission of information prior to that time.

MS. FISHER: I'm specifically -- for the record, I'm asking prior to the lawsuit --

MS. GILROY: Hang on.

MS. PROCTOR: Hold on. Monica has an objection as well.

MS. GILROY: I just wanted to join in -- Stewart Title Company joins in Mandy's objection.

Sorry, Paula.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 65

Q    Mr. Zeni, this is prior.

A    Can you please repeat the question?
I'm sorry.  It's a lot of --

Q    Yes.  Yes, sir.  Can you identify each
method by which Stewart Title Company transmits
information or communicates with the guaranty
company?

MS. PROCTOR:  I'm just going to object
to the scope of it.  If he has any information
regarding your claim and the transaction, he can
answer on behalf of STGC; and, of course, if he has
any personal knowledge on the question.

THE WITNESS:  Yeah.

BY MS. FISHER:

Q    For instance, like what platform -- is
there a shared repository?  Is there an email portal
that you-all collectively use together?  Is there a
shared folder?

A    There's too many questions at once.
With respect to your transaction, there was no
communication between STC and STG -- Stewart Title
Company or Stewart Title Guaranty Company.  Stewart
Title Company was not involved in any way in your
transaction.

Q    So there was no communication between

Eric Zeni
February 17, 2026

Page 66

the two subsidiaries -- Stewart Title Company and Stewart Title Guaranty Company -- before when?  Can you give me an approximate month or date -- month or year?

MS. PROCTOR:  So he's -- subject to my objection, he's going to be testifying -- to my scope objection and privilege objections, he's here to testify about presuit communications between Stewart Title Company and Stewart Title Guaranty Company regarding your claim and the transaction.

MS. FISHER:  This was for presuit, correct.

THE WITNESS:  I'm not aware of any communications between Stewart Title Company or STGC.  Stewart Title Company was not involved in this transaction.  Stewart Title Company is a wholly-owned policy-issuing agent that had nothing to do with this transaction, so there are no communications between the two entities, STC or STGC, that I'm aware of.

BY MS. FISHER:

Q    So there are no audit logs -- you can safely say there are no audit logs showing that STC transmitted anything to Stewart Title Guaranty Company prior to litigation?

Eric Zeni
February 17, 2026

Page 67

MS. PROCTOR: Object to the form. Vague in the use of client logs. It's also outside the scope. To the extent he has any personal knowledge regarding this transaction, or your claim, he can answer.

MS. FISHER: This fits directly under Topic 3 under "data received from STC" and --

MS. PROCTOR: Yeah. And subject to my letter of January 19, I limited it to the claims submitted by you to STGC.

THE WITNESS: I'm not aware of any. Again, STC had anything nothing to do with this transaction. Your sale was closed by Gurvey Law Group. STC, Stewart Title Company, would have nothing to do with it. I'm not aware of any recorded audit logs or any -- any communication whatsoever between STC or STGC.

BY MS. FISHER:

Q    Before Stewart Title Guaranty Company contracts with a third-party closing office, such as the Gurvey Law Group, do you review the contracts that are issued to the buyer and seller on behalf of Stewart Title Guaranty and the Gurvey Law Group?

MS. PROCTOR: Object to the form. Object to the scope. We're getting into closing

Eric Zeni
February 17, 2026

Page 68

functions.  And I also object to the scope to the extent it's beyond the transaction issue in this case.

THE WITNESS:  I don't understand the question.  It does not make sense.

BY MS. FISHER:

Q    I'm asking when you contract with a third-party office, do you require that you have to review the third-party closing office's production of paperwork that they give out to the seller and buyer on behalf of the guaranty company?

MS. PROCTOR:  Same objections.

BY MS. FISHER:

Q    Is that paperwork that the Gurvey Law Group would have made, or is that before that they would have pulled down from your virtual underwriting system?

A    I don't know what kind of paperwork you're referring to.

Q    Okay.  So you're not aware of any paperwork?

MS. PROCTOR:  Object to the form.  Misstates his testimony.

THE WITNESS:  Again, I don't know what paperwork you're referring to, other than a

Eric Zeni
February 17, 2026

Page 69

policy-issuing office can issue an STGC policy on behalf of STGC.  Other than that, I'm not sure what you might be referring to.

BY MS. FISHER:

Q   Not policy paperwork.  I'm -- other paperwork.

A   You just said paperwork --

Q   But your answer is --

A   -- by STGC.

Q   Your answer is notated for the record, Mr. Zeni, that you're not aware of any paperwork.

MS. PROCTOR:  Object.

THE WITNESS:  That's not what I said.

MS. PROCTOR:  Objection.  Paula, you're not here to testify, and you're misstating his testimony.  If there's a question, please ask it.

BY MS. FISHER:

Q   I asked if you're aware of any paperwork that a third-party closing office, such as, in my case, the Gurvey Law Group, gives to the buyer and/or the seller in a transaction.  Would Stewart Title Guaranty Company have to review that paperwork, general paperwork, with Stewart Title's name on it before you go under contract with an office and allow them to have access to your virtual

Eric Zeni
February 17, 2026

Page 70

underwriting system and issue policies?

MS. PROCTOR:  Object to the form.
Vague.  To the extent you're referring to Stewart Title Guaranty Company's name being on any other document, other than the title policy, it assumes facts not in evidence.  I'm also going to object to the scope because we're getting into closing duties, and we're also talking about transactions other than the transactions at issue in this case.

If he has any personal knowledge, or understands your question, he can answer.

THE WITNESS:  The -- the only thing I'm aware of a policy-issuing office issuing in STGC's name would be a policy.  Any other transactional documents or due diligence is conducted by either the parties, their attorney, or the closing -- the policy-issuing office.  STGC is not involved in the settling of the transaction, in the due diligence.

The only thing it permits is the policy-issuing office to issue an STGC policy.

BY MS. FISHER:

Q    Thank you, Mr. Zeni.  Mr. Zeni, can you identify all categories of information received from Stewart Title Company relating to my, the plaintiff's -- any communications, any dispute or

Eric Zeni
February 17, 2026

Page 71

complaint routing, claim intake routing, and litigation notice -- notices?

MS. PROCTOR:  Object to the form to the extent you're seeking information regarding any prelawsuit filing -- or, I'm sorry, postlawsuit filing communications.  If he has any information regarding presuit communications or responsive information, he can answer.

THE WITNESS:  Yeah.  Like I said earlier, I'm not aware of any communications between STC or STGC.  STC had no involvement with this transaction.

BY MS. FISHER:

Q     Did Stewart Title Guaranty Company have any other title search done after the closing of my transaction?

MS. PROCTOR:  Object to the form.

THE WITNESS:  Not that I'm aware of.

BY MS. FISHER:

Q     Did Stewart Title Guaranty Company receive any data from Stewart Title Company, regarding the purchaser's LLC after the close of this transaction?

MS. PROCTOR:  I'm going to object to the extent it seeks postlawsuit information, but if

Eric Zeni
February 17, 2026

Page 72

you can testify to any presuit --

MS. FISHER:  It would be presuit.

MS. PROCTOR:  Thank you for that clarification, Paula.

THE WITNESS:  No.  STC had nothing to do with this transaction.

BY MS. FISHER:

Q     Do you know if Stewart Title Company has any departments that typically route after closing issues transmissions to Stewart Title Guaranty Company after a policy is issued and a transaction is closed?

MS. GILROY:  I would object to the form, on behalf of Stewart Title Company.

MS. PROCTOR:  Same for Stewart Title Guaranty Company.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     Does Stewart Title Guaranty Company contend it received no information, any communications, or data from Stewart Title Company relating to anything we just spoke about; yes or no?

MS. PROCTOR:  Object to the extent it seeks --

MS. GILROY:  Object as to form.

Eric Zeni
February 17, 2026

Page 73

MS. PROCTOR:  And I'm going to object on privilege grounds, to the extent you're seeking postlawsuit notices or information.  He can testify --

MS. FISHER:  It would be prelawsuit, what we just spoke about.

THE WITNESS:  As I said repeatedly, there was no communication between STC and STGC.  STC had no involvement in your sale of your property.

BY MS. FISHER:

Q     Thank you for that, Mr. Zeni.  Okay. Just so the record is very clear, can you answer the next few questions yes or no, please?  It's what we covered, but I want a very clear record, please.

Is it Stewart Title Guaranty Company's testimony that Stewart Title Guaranty received no Stewart Title Company-originated information relating to the purchaser's LLC for this matter; yes or no?

MS. PROCTOR:  Object to the form. Asked and answered.

THE WITNESS:  Yeah.  I think your record is very clear.  As I said repeatedly, STC had no involvement.  There's no communication between

Eric Zeni
February 17, 2026

Page 74

STC or STGC.

BY MS. FISHER:

Q      Thank you.  Okay.  Let's move to Topic 4.

MS. PROCTOR:  Before we do, can we take a quick comfort break?  We've been going for about an hour.

MS. FISHER:  For like how long?

MS. PROCTOR:  Five minutes, or do you want to break for lunch?

MS. FISHER:  Can we break at 12:30 for like 20 minutes?

MS. PROCTOR:  We need five minutes now.

MS. FISHER:  Okay.  So for the record, we're off record at 11:49 a.m.

(Proceedings in recess from 11:49 to 11:59 a.m.)

MS. FISHER:  We're back on the record at 11:59 a.m.

For the record, Defendant previously took the position Mr. Borst would not be produced for his deposition, yet he is present today observing.  And I'd like this preserved for a motion to compel and for the Court to review later on.  I'm requesting that Mr. Borst, at a minimum, be not

Eric Zeni
February 17, 2026

Page 75

instructed to communicate with the witness or Counsel about testifying or exhibits during the breaks today.

MS. PROCTOR: Your request is noted, but there's no legal basis for your request. He is the client representative. He is allowed to be present at depositions, and he is here in his capacity as my claims rep for litigation purposes. His presence here does not make him a deponent, nor does it open him up for questioning.

And it's improper, I think, in the middle of this deposition to make such a record. If you have a question for the witness who is here to testify, please proceed.

MS. FISHER: Ms. Proctor, can you please confirm on the record that no one, including Mr. Borst, will discuss the substance of this testimony, pending questions, or exhibits with the witness during the break, or are you stating that Mr. Borst is entitled to do that?

MS. PROCTOR: I am not here to testify, so I'm not going to make any stipulation in that regard. If you have a question for Mr. Zeni, he is here as the corporate rep for Stewart Title Guaranty Company. Please move on with your questions.

Eric Zeni
February 17, 2026

Page 76

MS. FISHER:  Okay.  Understood.

BY MS. FISHER:

Q     Mr. Zeni, can you tell me, what is the earliest date Stewart Title Guaranty had first knowledge of the plaintiff's matter?

MS. PROCTOR:  I'm going to object to extent your seeking postlawsuit notices.  If he has any presuit knowledge, he can answer.

THE WITNESS:  Are you talking Plaintiff's matter, this lawsuit?

BY MS. FISHER:

Q     No.  I'm talking about general, when you first had -- when Stewart Title Guaranty Company first had knowledge that there was a problem with the buyer and the defective chain of title.

MS. PROCTOR:  Object to the form. Assumes facts not in evidence.

THE WITNESS:  STGC would have become aware of your claims regarding the property when you submitted your notice of claim.  I don't recall the specific date.  If you have a copy of the notice of claim you would like to show me, I am sure that would refresh my recollection.

BY MS. FISHER:

Q     Okay.  And when did Stewart Title

Eric Zeni
February 17, 2026

Page 77

Guaranty Company first have knowledge of a lawsuit, the plaintiff's lawsuit, my lawsuit?

MS. PROCTOR: Object on the basis of common interest, attorney-client, and work product. I'm instructing the witness not to answer.

MS. GILROY: We would join.

BY MS. FISHER:

Q Mr. Zeni, can you confirm or deny that Stewart Title Guaranty Company was notified of the plaintiff's lawsuit on around February of 2025?

MS. PROCTOR: Same objection. I'm instructing the witness not to answer.

BY MS. FISHER:

Q So you can't tell me when you first became aware of my lawsuit?

MS. PROCTOR: Objection. I'm instructing the witness not to answer.

BY MS. FISHER:

Q Mr. Zeni, did you review, in preparation today, a copy of my first amended complaint and all the sworn declarations that were entered into the Federal court?

MS. PROCTOR: Objection to the form of the question and objection to it being outside the scope of the notice topics. As modified in my

Eric Zeni
February 17, 2026

Page 78

January 19 letter, he can answer if he has personal knowledge.

THE WITNESS:  I don't recall doing that.

BY MS. FISHER:

Q     Mr. Zeni, are you just refusing to answer that, or is there someone better who can answer these questions?

MS. PROCTOR:  Objection form.  It's out of scope.

THE WITNESS:  Anything I have not answered I've done at the direction of my counsel.

BY MS. FISHER:

Q     Okay.  Mr. Zeni, you are aware that declarations by your counsel and Stewart Title Guaranty Company were signed and entered into a Federal case; correct?

MS. PROCTOR:  Object to the form.  It's out of scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     So you don't know, sitting here as Stewart Title Guaranty Company's 30(b)(6) witness, what has been entered into this Federal case?

MS. PROCTOR:  Object to the form.

Eric Zeni
February 17, 2026

Page 79

Outside the scope of what he is here to testify for as a corporate rep of STGC.

THE WITNESS:  No, not aware.

BY MS. FISHER:

Q    **Topic 4 is regarding Stewart Title Guaranty Company's internal handling, routing, the review, the first knowledge, the dates, internal communications, and who was involved; correct?**

MS. PROCTOR:  Object to the form. Outside the scope.

Paula, would you like me to show him the notice?

MS. FISHER:  You did at the beginning, Ms. Proctor.  You don't need to again.

MS. PROCTOR:  Well, he has it in front of him, so he's referencing it now.

THE WITNESS:  So I see your notice --

BY MS. FISHER:

Q    **Mr. Zeni --**

A    Let me finish.  I see your notice and, as I said at the outset, I'm prepared to testify as to the topics noted in our counsel's January 19, 2026, correspondence to you.

Q    **But did you review that -- the plaintiff's notice of deposition of the Stewart**

Eric Zeni
February 17, 2026

Page 80

Title Guaranty Company Rule 30(b)(6)?  Did you review that notice?

A     Yes.

Q     Can you tell me what Stewart Guaranty Title Company system was used to handle and track the plaintiff's matter, the claims platform, ticketing?

MS. PROCTOR:  Object to the form. Ticketing is vague.  I'm also going to object on privilege grounds.  He can testify to any presuit-claims handling or [audio distortion] regarding your claim.

THE WITNESS:  Also, can you define "Plaintiff's matter"?

BY MS. FISHER:

Q     Any complaint, regulatory claim -- any complaint directly to Stewart Title Guaranty Company, to Stewart Title Company, and the Federal lawsuit?

MS. PROCTOR:  Object to the extent you're seeking information regarding a lawsuit on privilege grounds, common interest, work product, attorney-client.  Also objecting as outside the scope to the extent you're seeking information regarding STC.  He can testify with respect to

Eric Zeni
February 17, 2026

Page 81

claims handling as a corporate rep of STGC for purposes of your claim presuit.

MS. GILROY:  Stewart Title Company joins.

THE WITNESS:  Okay.  I'm not aware of anything involving STC for all the reasons I previously stated.  Solely with respect to the claim you submitted and any complaints filed to regulatory agencies that were directed to STGC, those would have been entered into our file management system legal files.

BY MS. FISHER:

Q    Who at Stewart Title Guaranty is responsible for the administration of those files?

A    The assigned claims handler.

Q    Do you have their name?

A    For your claim, it was Marimar Soltero, Esquire.

Q    Stewart Title Guaranty Company provided written responses to the Georgia insurance regulator regarding the plaintiff's complaint; correct?

A    Yes.

Q    Did those responses reflect Stewart Title Guaranty Company's factual positions and the basis for its handling and denial posture?

Eric Zeni
February 17, 2026

Page 82

MS. PROCTOR:  Object to the form. Compound.

THE WITNESS:  Yes they, did.

BY MS. FISHER:

Q     Before Stewart Title Guaranty Company sent those responses back to the Georgia insurance regulator, did Stewart Title Guaranty Company perform internal review of the file and internal communications?

MS. PROCTOR:  I'm going to object on the basis of work product since a complaint had already been filed by you in connection with the claims, so I'm going to instruct the witness not to answer.

BY MS. FISHER:

Q     Can you tell me who at Stewart Title Company contributed to the information used in the regulatory response?

MS. PROCTOR:  I'm going to object to the form.  He can testify regarding who authored the response, but, other than that, I think information is protected from disclosure by the work product doctrine.

THE WITNESS:  I authored the responses.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 83

Q      And this was before the lawsuit; correct?

A      I -- I don't recall.

Q      You don't recall the month or the date that you responded to the insurance commissioner? You don't recall if it was before the lawsuit or after I filed the Federal lawsuit?

MS. PROCTOR:  No.  You can testify regarding when you sent the DOI response, if you know.

THE WITNESS:  Regardless, I don't know when the lawsuit was filed.  I don't remember when I sent -- what the dates are on my responses to the DOI.  If you have them and want to show them to me, that would refresh your recollection.  Otherwise, the documents speak for themselves.

BY MS. FISHER:

Q      The lawsuit was filed February of 2025, and Amanda -- Ms. Proctor just said she had objected on client-attorney work product privilege, so it was prelawsuit.

MS. PROCTOR:  Is there a question, Paula?

MS. FISHER:  Yes.  The question I asked, if -- before Stewart Title Guaranty Company

Eric Zeni
February 17, 2026

Page 84

sent those responses, did the guaranty company perform an internal review of the file and internal communications, and you instructed Mr. Zeni not to answer.

MS. PROCTOR: Correct.

MS. FISHER: But this was prelawsuit?

MS. PROCTOR: Correct. The work product privilege can attach prior to the actual filing and lawsuit. It attaches when there's an anticipation of litigation. At that point, you had already filed, I believe, two complaints with the department of insurance for the state of Texas and for the state of Georgia. So it's our position that litigation was anticipated at that time.

BY MS. FISHER:

Q    Mr. Zeni, do you agree, as Stewart Title Guaranty Company's witness, that they should not present factual conclusions to a regulator unless supported by the information Stewart Title Guaranty Company had at the time?

MS. PROCTOR: Object to the form.

THE WITNESS: I don't understand the question.

BY MS. FISHER:

Q    Let me rephrase this:  In the letter

Eric Zeni
February 17, 2026

Page 85

that was sent back to the Georgia Insurance Commissioner, can you confirm it was factual conclusions?

MS. PROCTOR:  I'm sorry.  Can you repeat the question?  Can he confirm the factual conclusions?  Was that the question?

MS. FISHER:  Yes.  My original question was:  Do you agree Stewart Title Guaranty Company should not present factual conclusions to a regulator unless it's supported by the information Stewart Title Guaranty Company had at the time?

MS. PROCTOR:  And I objected to the form, and he said he didn't answer, and then there was a -- another question, and I'm asking you to repeat that next question.

MS. FISHER:  That was the whole question to that.

BY MS. FISHER:

Q    What was the answer to that?

A    There was a second question.  I'm very confused right now, so --

Q    I asked it in a different way.

A    So I only can respond to one pending question.  So, again, I'm confused.  I don't know what question is open at this time.

Eric Zeni
February 17, 2026

Page 86

Q    Okay.  Let me repeat the question:  Do you agree Stewart Title Guaranty Company should not present factual conclusions to a regulator, unless it's supported by the information Stewart Title Guaranty Company had at the time?

MS. PROCTOR:  Object to the form.  Outside the scope.  If he has any information regarding a -- specific DOI responses related to your claim, he can answer, if he understands the question.

THE WITNESS:  Again, like I said earlier, I don't understand the question.  If you want to ask me a question about my response and show me the document to the refresh my recollection, I'd be happy to take a look at it.

BY MS. FISHER:

Q    Understood.  As of the date of your letter, did Stewart Title Guaranty Company evaluate corrective action to address any mismatch, the invalidity grantee concern?

MS. PROCTOR:  Object to the form.  Vague as in the use of the term "letter."  Which letter and what date?  And, also, it's vague in the remainder of your question.  And then I'm going to object to it being outside the scope.  If he

Eric Zeni
February 17, 2026

Page 87

understands the question, he can answer it.

THE WITNESS:  Yeah.  I don't understand what you're asking.

BY MS. FISHER:

Q    I'm asking when you responded, Mr. Zeni.  The letter you, yourself offered to the regulator, did you evaluate corrective action at the time?

MS. PROCTOR:  Object to the form.  Vague and ambiguous as to the phrase "corrective action."  Also, it's --

BY MS. FISHER:

Q    It's yes or no.

MS. PROCTOR:  Let me raise my objections.  If you want to show him the document to which you're referring, that would probably be helpful.

THE WITNESS:  I can't answer your question.  It's not a yes-or-no question.  I don't know what you mean by corrective action.  If you want to ask me a question about the document, please show it to me.

BY MS. FISHER:

Q    Corrective action meaning that -- taking measures, once it was brought to your

Eric Zeni
February 17, 2026

Page 88

attention, that the LLC was never registered or a legal entity.  Corrective action I mean to correct the chain of title at that point.  Did you take that into consideration for that -- what corrective measures or action you could have tooken at that point, once the insurance commissioner notified you?

MS. PROCTOR:  Object to the form. Vague.  Outside the scope of what this witness is here to testify about.  If you have a question about the specific response, please show him the document.

THE WITNESS:  My response speaks for itself.  The letter speaks for itself.  To the extent I recall it without having it in front of me, it noted you were not an insured, so STGC owed no duty to do anything.  We didn't have a claim from our insured, and I believe further noted that even if we did receive a claim from our insured regarding the formation or licensure or anything to do with the formation of the LLC, that would not be covered under the policy as an actively insured, pursuant to Exclusion 3A.

BY MS. FISHER:

Q    So, Mr. Zeni, very specifically, do you recall the two phone calls that you had at length with the insurance commissioner's office?  And those

Eric Zeni
February 17, 2026

Page 89

calls are recorded.

MS. PROCTOR:  Object to the form.

THE WITNESS:  No, I don't recall having any phone calls with the --

BY MS. FISHER:

Q    Okay.  Thank you.

A    -- insurance commissioner.

Q    Pardon me.  What was the last thing?

A    I don't recall having any phone calls with the insurance commissioner.

Q    Thank you.  Mr. Zeni, can you describe to me Stewart Title Guaranty Company's standard procedure for receiving a summons and complaint in the lawsuit?

MS. PROCTOR:  Object to the form. Outside the scope.  And it's privileged information, and I'm instructing him not to testify on that topic.  He's here to discuss your presuit claims.

MS. FISHER:  This goes directly to my Topic 5, service of process and actions taken.

MS. PROCTOR:  For the record, my January 19 letter responded to Topic 5 and said, "STGC will not be designating a corporate representative to testify regarding this topic. STGC did not receive a response to -- in the

Eric Zeni
February 17, 2026

Page 90

January 19 letter.

MS. FISHER: Okay. And, respectfully Ms. Proctor, for the record, you, yourself, authored a sworn declaration into this record, as well as Stewart Title Guaranty Company, so this should be a topic open for discussion, but your position is very well notated.

BY MS. FISHER:

Q    Mr. Zeni, does Stewart Title Guaranty Company use a registered agent to accept service?

MS. PROCTOR: Same objection. He's not here to testify regarding Topic No. 5.

BY MS. FISHER:

Q    Can you identify the registered agent Stewart Title Guaranty Company uses?

MS. PROCTOR: Same objection.

MS. FISHER: You're instructing the witness not to answer?

MS. PROCTOR: I'm just going to say it's outside the scope. If he has any personal knowledge, he can specify or identify the corporate representative, but it's in his capacity as a regular witness, not as a corporate rep.

THE WITNESS: I don't know.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 91

Q      You don't know if it's CT corporation?

MS. PROCTOR:  Same objection.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q      Do you know if Stewart Title Guaranty Company maintains a service-of-process log or legal intake tracking system?

MS. PROCTOR:  Sorry.  Can you repeat that question, Paula?  I missed that.

BY MS. FISHER:

Q      Yeah.  Does Stewart Title Guaranty Company maintain a service-of-process log or legal intake tracking system?

MS. PROCTOR:  I'm going to object to it being outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q      Mr. Zeni, can you tell me who is the custodian responsible for maintaining a log or tracking system for complaints?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q      Can you identify every action taken by

Eric Zeni
February 17, 2026

Page 92

Stewart Title Guaranty Company relating to Plaintiff's complaint after it entered the guaranty company system? I just want the actions, not legal advice. I want to know if a file was opened? Created? Routed internally?

MS. PROCTOR: I'm going to object to it being outside the scope. And now that you're getting into actions and decisions by Stewart Title Guaranty Company after you filed your lawsuit, it's also privileged or product common interest protected, so I'm instructing the client not to answer.

MS. FISHER: Okay. And I respect that, Ms. Proctor. For the record, in the motion to set aside default, in that filing it says that Stewart Title Guaranty Company first become aware and retained counsel after April 7, 2024.

MS. PROCTOR: That's not what it says, and you're not here to testify. Please ask your question of the witness.

MS. FISHER: I just want a very clear record of that.

MS. PROCTOR: The filing is the best record of that. Please ask the witness your next question.

Eric Zeni
February 17, 2026

Page 93

BY MS. FISHER:

Q    Sitting here today, can you identify the first internal record showing Stewart Title Guaranty Company had Plaintiff's complaint in its possession or system?

MS. PROCTOR:  Objection.  Outside the scope, and it's privileged information that you're seeking.  I'm instructing him not to answer.

BY MS. FISHER:

Q    In Stewart Title Guaranty Company's procedures, is there a difference between formal service and actual notice and awareness of a lawsuit?

MS. PROCTOR:  Objection.  Vague and outside the -- if you have any nonprivileged information responsive, you can answer.

THE WITNESS:  I'm not aware.  I don't know.

BY MS. FISHER:

Q    Can you tell me if Stewart Title Guaranty takes action upon actual notice, even if Stewart Title Guaranty contends service is defective?

MS. PROCTOR:  Objection.  Outside the scope.  Seeks privileged information protected from

Eric Zeni
February 17, 2026

Page 94

disclosure by the work product doctrine, attorney-client privilege, and common interest privileges. I'm instructing the witness not to answer.

BY MS. FISHER:

Q     Under Stewart Title Guaranty's standard operating procedure, can Stewart Title Guaranty decide the challenge service after internal awareness and routing has already occurred?

MS. PROCTOR:  Same objections.  I am instructing the witness not to answer.

BY MS. FISHER:

Q     Can you tell me who made the decision to contest for challenge of service in this case?

MS. PROCTOR:  Same objection.  I'm instructing the witness not to answer.

BY MS. FISHER:

Q     Mr. Zeni, can you tell me when Stewart Title Guaranty Company's registered agent, CT Corporation, receives a summons or complaint, does the agent generate a transmittal or forward the record?

MS. PROCTOR:  Object to the form of the question.  Object to it being outside the scope, and object on the same privilege grounds previously raised.  Any communications between Stewart Title

Eric Zeni
February 17, 2026

Page 95

Guaranty Company and it's registered agent is privileged. And, also, your question assumes facts not in evidence. I'm instructing the witness not to answer.

BY MS. FISHER:

Q    For this case specifically, did Stewart Title Guaranty Company obtain or review the registered agent's transmittal --

MS. PROCTOR: Same objection --

BY MS. FISHER:

Q    -- records for contesting service?

MS. PROCTOR: Sorry, Paula. I didn't mean to interrupt your question. Same objection. I'm instructing the witness not to answer.

BY MS. FISHER:

Q    Mr. Zeni, can you identify all Stewart Title Guaranty Company departments that were notified of Plaintiff's complaint?

MS. PROCTOR: Same objection. I'm instructing the witness not to answer.

BY MS. FISHER:

Q    Is the notice chain reflected in any system-generated routing history or email trail?

MS. PROCTOR: Same objections. It's also vague, so I'm instructing the witness not to

Eric Zeni
February 17, 2026

Page 96

answer.

BY MS. FISHER:

Q    Did Stewart Title Guaranty Company get any communication from Stewart Title Company on Plaintiff's lawsuit that was filed?

MS. PROCTOR:  I'm objecting on the basis of common interest work product protected grounds and instructing the witness not to answer. It's also outside the scope.  Sorry.

MS. GILROY:  And Stewart Title joins.

BY MS. FISHER:

Q    Mr. Zeni, did you review before -- in preparation of this deposition, did you review or discuss Stewart Title Company's deposition of the 30(b)(6) witness?

MS. PROCTOR:  Object to the form, and I'm going to object to the extent you're calling for communications he had with counsel in preparation for the deposition.  If he has any nonprivileged information responsive to your question, he can answer.

MS. GILROY:  And STC would join in that objection.

THE WITNESS:  No.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 97

Q      You did not review Stewart Title Company's deposition?

MS. PROCTOR:  Objection.  Asked and answered.

THE WITNESS:  No.

BY MS. FISHER:

Q      Can you confirm that a legal hold was applied and a preservation order was distributed on all matters concerning the plaintiff?

MS. PROCTOR:  Object to the form.  This is outside the scope of what he's been noticed to testify about regarding today.

THE WITNESS:  So, like I said earlier, none of your claim files, or the over-limits approval file, are scheduled on a document destruction schedule.  They're being maintained, and I believe also a legal hold was implemented.

BY MS. FISHER:

Q      Do you have any idea what that date was?

MS. PROCTOR:  Same objection.

THE WITNESS:  I don't recall.

BY MS. FISHER:

Q      Thank you.  Now I'd like to discuss the guaranty company's remediation practices postmatter

Eric Zeni
February 17, 2026

Page 98

implementation following prior matters in which Stewart Title Guaranty Company determined that an issuance deed [audio distortion] improper issuance occurred. To be clear, I'm not asking for the underlying facts of any specific case. I'm asking only about Stewart Title Guaranty Company's general frameworks, policies, and implementations that exist as a result of prior matters, Mr. Zeni. Do you understand?

MS. PROCTOR: Object to form. Outside the scope.

THE WITNESS: I'll try to answer your questions the best I can.

BY MS. FISHER:

Q    Thank you. As a result of prior matters involving issuance defects or improper issuance, did Stewart Title Guaranty formalize any remediation or curative action framework?

MS. PROCTOR: Object to the form. Vague, as well as outside the scope.

THE WITNESS: I don't understand what you're asking.

BY MS. FISHER:

Q    I'm asking in any prior matters, such as what happened with my case, the nonexistent

Eric Zeni
February 17, 2026

Page 99

entity being able to purchase my home, does Stewart Title Guaranty Company -- did they formalize any remediation or curative action plan or framework or policy and procedures?

MS. PROCTOR:  I'm going to object to this being way outside the scope.  I think you're referring to Topic No. 6, Ms. Fisher, and we said we would not be designating a corporate representative on that topic.  I also think that the -- going to object on the basis of form because it's vague, ambiguous.

If he understands your question and has personal knowledge, he can answer.

THE WITNESS:  Yeah.  I mean, I don't know.

BY MS. FISHER:

Q     Is that something that would -- that SISCO is -- the SISCO -- the Stewart Enterprise, the parent company, is that something that would be facilitated and come from their direction?

MS. PROCTOR:  Object to the form and way outside the scope.

THE WITNESS:  I don't think so.

BY MS. FISHER:

Q     Can you identify categories of insured

Eric Zeni
February 17, 2026

Page 100

protection actions Stewart Title Guaranty Company recognizes when issuances go wrong, such as curative measures, corrective instruments, underwriting intervention, agent remediation?  Does Stewart Title Guaranty Company take any corrective action?

MS. PROCTOR:  Object to the form. Outside the scope.  This is way beyond the transaction issue in this case, and it's undefined in time.  It's vague in its use of the phrase "issuance gone wrong," for example.  If he has any personal knowledge and, more importantly, he understands the question, he can answer.

THE WITNESS:  I do not understand the question.

BY MS. FISHER:

Q    Prior matters involving issuance defects, did Stewart Title Guaranty Company implement any new or revised underwriting procedures intended to prevent improper issuance?

MS. PROCTOR:  Same objections.

THE WITNESS:  I don't understand the question.

BY MS. FISHER:

Q    Following prior matters involving issuance defects, did Stewart Title Guaranty

Eric Zeni
February 17, 2026

Page 101

implement training for agents, underwriters, or claims personnel regarding entity verification and improper issuance?

MS. PROCTOR: Object to the form. Vague. Ambiguous. Outside the scope, as it's not limited to the transaction or even the issues relevant to this transaction. If he has any personal knowledge, he can answer.

THE WITNESS: I don't know.

BY MS. FISHER:

Q So when an issue arises, after closing, does Stewart Title Guaranty Company take any corrective action when they're contacted?

MS. PROCTOR: Object to form. Vague and over broad in the use of the term "issue." It's outside the scope too because it's not limited to this transaction or even issues relevant to this transaction. If he has any personal knowledge or understands the question, he can answer.

THE WITNESS: I don't really understand the question. All I know is that, if STGC receives a claim, we handle the claim.

BY MS. FISHER:

Q I'm not necessarily asking about a claim. Like in my instance, I didn't have rights to

Eric Zeni
February 17, 2026

Page 101

implement training for agents, underwriters, or claims personnel regarding entity verification and improper issuance?

MS. PROCTOR:  Object to the form. Vague.  Ambiguous.  Outside the scope, as it's not limited to the transaction or even the issues relevant to this transaction.  If he has any personal knowledge, he can answer.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     So when an issue arises, after closing, does Stewart Title Guaranty Company take any corrective action when they're contacted?

MS. PROCTOR:  Object to form.  Vague and over broad in the use of the term "issue."  It's outside the scope too because it's not limited to this transaction or even issues relevant to this transaction.  If he has any personal knowledge or understands the question, he can answer.

THE WITNESS:  I don't really understand the question.  All I know is that, if STGC receives a claim, we handle the claim.

BY MS. FISHER:

Q     I'm not necessarily asking about a claim.  Like in my instance, I didn't have rights to

Eric Zeni
February 17, 2026

Page 102

the policy.  Stewart Title Company directed me to open a claim for curative action.  But, in my case, since I didn't have rights to a policy, Stewart Title Guaranty Company doesn't have any internal curative measures where they could correct on their own, take their own initiative, and willfully correct or cure a title defect in the land records?

MS. PROCTOR:  Object to the form.  Way beyond the scope of what this witness is here to testify about, and it's vague and ambiguous.

MS. GILROY:  Stewart Title Company joins.

THE WITNESS:  With reference to your transaction, Stewart Title Guaranty Company had no duty to do anything or correct on it.  As we discussed earlier, you had no policy, so we had no duty to do anything.  You sold the property to the purchaser.  Purchaser took title.  The purchaser, if it was not properly formed, that, as I said, a few times before, would be a matter that would not be covered under the owner's policy.

So Stewart Title Guaranty Company had no duty to do anything with respect to this transaction after receiving a claim.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 103

Q      And I'm not asking under the policy. I'm asking outside of the policy, and you answered my question.  Does Stewart Title Guaranty Company recognize that an issuance that can cause harm to parties, other than the named insured, such as a prior owner, seller, a or third party affected by an invalid conveyance?

MS. PROCTOR:  Object to the form. Vague, ambiguous, and outside the scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  Stewart Title Guaranty Company is a title insurance company.  It has duties to its insureds that have purchased policies from it, or from its policy-issuing offices, and all of Stewart Title Guaranty Company's duties are outlined in the four corners of the title insurance policy. That's it.  That's the limit of its responsibilities and duties.

BY MS. FISHER:

Q      Mr. Zeni, to be clear again for the record, I'm not suing or anywhere in my complaint I'm suing under rights of a title policy.  This question I'm asking you, specifically, do you recognize that an issuance defect can cause harm to parties, other than the named insured?

Eric Zeni
February 17, 2026

Page 104

MS. PROCTOR: Object to the form. Outside the scope, and asked and answered.

BY MS. FISHER:

Q When Stewart Title Guaranty becomes aware that a public record is defective due to an issuance defect, does Stewart Title Guaranty Company, do they have remediation framework for curative action intended to correct the public land records, even if the person seeking the cure is not the named insured?

MS. PROCTOR: Object to the form. Vague and ambiguous for multiple reasons, including terms like "issuance defect, corrective action." It's also outside the scope. If he has any personal knowledge to answer your question, he can answer.

THE WITNESS: Stewart Title's only duties are to its insureds under its policies of title insurance. If we get a covered claim from an insured and it's covered, then we can exercise our options under the policy to address the claim and resolve the claim.

Other than a claim received from an insured, Stewart Title Guaranty Company has no duties to do anything, only to its insureds under its policies of title insurance.

Eric Zeni
February 17, 2026

Page 105

BY MS. FISHER:

Q    Is Stewart Title Guaranty Company's decision to implement curative action ever made at risk -- a corrective measure to protect the integrity of the title land records separate from paying any claim to a named insured?

MS. PROCTOR:  Same objections.  Form. Outside the scope.

THE WITNESS:  I don't understand the question.

BY MS. FISHER:

Q    Okay.  To be clear for the record, I'm not asking about coverage.  We keep going back to a title policy.  I'm asking whether Stewart Title Guaranty Company recognizes and uses curative action as a corrective measure when issuance went wrong and the public land records needs to be fixed.

MS. PROCTOR:  I believe he said he didn't understand --

BY MS. FISHER:

Q    Can you tell me --

MS. PROCTOR:  -- your question.

BY MS. FISHER:

Q    Can you tell me who inside Stewart Title Guaranty Company decides whether curative

Eric Zeni
February 17, 2026

Page 106

action is pursued?

MS. PROCTOR:  Object on the basis of form.  Vague in its use of "corrective action."  Unlimited by issue or this transaction.  It's also way outside the scope of what this witness is prepared to testify about today.  If he has any personal knowledge or understands the question, he can answer.

THE WITNESS:  The only time STGC would commence corrective actions -- curative actions, rather, would be in response to a claim received by one of our insured's under a policy of title insurance, assuming that the claim was covered.

BY MS. FISHER:

Q      Thank you.

THE WITNESS:  Break for lunch?

MS. PROCTOR:  Paula, when we get to a good stopping place for lunch --

MS. FISHER:  Can we do that at 1:30?

THE WITNESS:  No.  That's way too --

MS. PROCTOR:  How about 1:00?

MS. FISHER:  We keep taking these breaks.  We just got back on the record 45 minutes ago.

MS. PROCTOR:  So 1:00 would be fine.

Eric Zeni
February 17, 2026

Page 107

That will be an hour.

MS. FISHER:  So you plan on taking breaks every hour?

MS. PROCTOR:  Yes, I --

MS. FISHER:  Didn't you say Mr. Zeni needs to get back on a plane?  What time is that?

MS. PROCTOR:  7:00, I think.  We can take a short 20 minutes for lunch.

MS. FISHER:  I need to take a half hour, so do you want to do that at 1:00 from 1:00 to 1:30?

MS. PROCTOR:  I think that works for us.

MS. FISHER:  Okay.

BY MS. FISHER:

Q    After Stewart Title Guaranty Company learned of the LLC mismatch, did Stewart Title Guaranty Company open any internal escalation, compliance review, or underwriting review?

MS. PROCTOR:  Object to the form.  "LLC mismatch" is vague and ambiguous, and this is outside the scope of what he's here to testify about.  If he has any personal knowledge, he can answer.

THE WITNESS:  I don't understand the

Eric Zeni
February 17, 2026

Page 108

question.  I don't know what you mean by "LLC mismatch."

BY MS. FISHER:

Q    So Catalyst REI is incorporated. They're not an LLC.  It was in the documents that were sent to the regulator, the insurance commissioner, that you have reviewed and you responded to.  So the mismatch would be limited liability company versus incorporation.  Once you were made aware of that, Mr. Zeni, did Stewart Title Guaranty open any internal escalation or compliance review?

MS. PROCTOR:  To the extent you're asking him regarding actions taken by STGC in response to your DOI complaints, I'm going to object based on the basis of work product, attorney-client privilege grounds, and instruct him not to answer. If -- he can testify to the response to your DOI complaint, although it would probably be helpful if you showed him the documents you're referring to.

BY MS. FISHER:

Q    But from your personal knowledge, Mr. Zeni, you don't remember if you investigated the issue?

MS. PROCTOR:  I'm objecting on

Eric Zeni
February 17, 2026

Page 109

privilege grounds and instructing him not to answer.

BY MS. FISHER:

Q     Before communicating your position to the regulator, such as no harm, fraud not established, did Stewart Title Company complete objective steps regarding the grantee's entity, their legal existence?

MS. PROCTOR:  I'm not sure I understand the question, but let me lodge the objection the best way I know how to.  I'm going to object to the form of the question, because it's vague.  To the extent you're asking what actions STC took in response to the complaint set and filed with the DOI, that information is privileged, and I'm instructing him not to answer.

MS. FISHER:  Thank you.

MS. PROCTOR:  If I misunderstood your question, please let me know.

MS. FISHER:  No.  That's fine.  After every question, if you're instructing him not to answer, just please state that for the record. That's fine.

BY MS. FISHER:

Q     After learning of the issue, did Stewart Title Guaranty Company instruct or request

Eric Zeni
February 17, 2026

Page 110

any curative action such as a corrective deed, corrective affidavit, or reformation request or other curative pathway?

MS. PROCTOR: Same objections. To the extent you're asking what actions were taken by Stewart Title in response -- Stewart Title Guaranty Company in response to your DOI complaints, that information is privileged, and I'm instructing the witness not to answer.

BY MS. FISHER:

Q    Mr. Zeni, did you or Stewart Title Guaranty Company ever evaluate whether a recorded deed reflecting a fictitious LLC could create a cloud on title or impair marketability?

MS. PROCTOR: Object to the form and outside the scope, to the extent we're talking about a transaction other than the one at issue in this case.

THE WITNESS: In response to the claim, the claim was denied. There was no coverage for the reasons set forth and discussed previously --

BY MS. FISHER:

Q    This isn't in regards to a claim, Mr. Zeni.

A    Then I don't understand the question.

Eric Zeni
February 17, 2026

Page 111

Q    I'm talking about before the claim. When you received the complaint from the insurance commissioner, the claim is separate.  A claim isn't filed through the insurance commissioner.  A complaint is filed through the insurance commissioner.  A claim is filed through the guaranty company.  I'm talking about the complaint to the insurance commissioner.

MS. PROCTOR:  Are you asking what actions Stewart Title Guaranty Company took after you filed a complaint with the department of insurance?

MS. FISHER:  Yes.

MS. PROCTOR:  I'm objecting on the basis it's work product, attorney-client privileged information, and I'm instructing him not to answer. Stewart Title Guaranty Company reasonably anticipated litigation when complaints -- multiple complaints were filed with the department of insurance in two states.

BY MS. FISHER:

Q    Does Stewart Title Guaranty Company have the authority to require agent cooperation to address defects arising from a policy issued on Stewart Title Guaranty paper?

Eric Zeni
February 17, 2026

Page 112

MS. PROCTOR:  Object as to outside scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  STGC expects policy-issuing agents to cooperate in response to claims investigations when the claims department reaches out to a policy-issuing agent.

MS. FISHER:  Okay.  Do you want to take a 20-minute lunch break to 1:15?  It's 12:54 right now.

MS. PROCTOR:  I think we talked about 30 minutes.

MS. FISHER:  Can we shorten it?  We have a bit of a ways to go, and we don't want Mr. Zeni to miss his flight tonight.

THE WITNESS:  I'm not missing my flight.

MS. FISHER:  So did you want to do the 20 minutes like you originally suggested, or you want to stick to a half hour?

MS. PROCTOR:  Half hour.

MS. FISHER:  Okay.  So let's resume at 1:25.  Does that sound good?

MS. PROCTOR:  Sounds great.

MS. FISHER:  Okay.  Thank you.

Eric Zeni
February 17, 2026

Page 113

(Proceedings in recess from 12:54 p.m. to 1:23 p.m.)

MS. FISHER:  We're back on the record at 1:23 p.m. Eastern time.

BY MS. FISHER:

Q     Now let's cover all the systems, insured platforms, Virtual Underwriter, enterprise tools used jointly by Stewart Title Company and Stewart Title Guaranty Company for a transmission of the underwriter data, title search information, or filing -- handling.  When I say "used jointly," that includes systems where both Stewart Title Company and Stewart Title Guaranty Company personnel can access the same platform or repository, even if they use different permission tiers.

Do you understand?

MS. PROCTOR:  Object to form.  Outside the scope.

THE WITNESS:  Yes.

MS. FISHER:  Counsel, just so you're aware, and for the record, Stewart Title Company perviously represented that Stewart Title Guaranty Company is the entity that can answer these questions regarding policy issuance, underwriting, and entity verification.

Page 114

Is Stewart Title Guaranty Company now taking the position that it cannot answer those questions?

MS. GILROY:  I'll just object for the record.  I don't believe that properly characterizes STC's prior representation.

MS. FISHER:  It's in the deposition.

MS. PROCTOR:  Okay.  I'm going to join --

MS. GILROY:  My --

MS. PROCTOR:  -- in that.  I've read the transcript, and you are blatantly mischaracterizing it.  And it also --

MS. FISHER:  Okay.

MS. PROCTOR:  -- misstates any testimony by this witness here today.  But if there's a question, I suppose you can ask it.

MS. FISHER:  Can you tell me on what grounds you're objecting?

MS. PROCTOR:  The same as Monica.

MS. GILROY:  This is --

MS. PROCTOR:  Go ahead, Monica.  I didn't mean to interrupt.  Please.

MS. GILROY:  No, no.  I didn't mean to interrupt you.  No.  I mean, it's very basic, Paula.

Eric Zeni
February 17, 2026

Page 115

That is not at all what the 30(b)(6) of Stewart Title Company said.  No one defers to STGC.

MS. FISHER:  No, prior -- yeah.  To -- when Ms. Proctor, when I reviewed what we're going to be covering, you had said you're objecting.

MS. PROCTOR:  That's correct.  I'm objecting on the same basis as Monica.  I have reviewed the transcript and I think that, in asking your question, you have mischaracterized the testimony of Stewart Title Company's corporate rep.

MS. FISHER:  Okay.

BY MS. FISHER:

Q    Okay.  Mr. Zeni, can you please name every system platform tool used jointly by Stewart Title Company and Stewart Title Guaranty Company for underwriting data transmissions, title search information, and file handling of underwriting?

MS. PROCTOR:  Object to the form.  Outside the scope.  As set forth in my January 19 letter, he's here to testify regarding any systems, platforms, and tools used jointly by STGC and STC, in any, in connection with the transaction issue in this complaint.

If he has any information in that report, or more broadly, based on personal

Eric Zeni
February 17, 2026

Page 116

knowledge, he can answer.

THE WITNESS:  I'm not aware.

MS. FISHER:  For the record, Ms. Proctor, this is a 30(b)(6) deposition, and the topic was in the notice.  You cannot block it simply because you objected in a letter.  That objection should have been raised via protective order motion, a motion to limit the scope, or a court ruling.  A letter is not a court order, just for the record, but I do note your position.

MS. PROCTOR:  And I'm going to also note we did not receive a response from you in -- to this January 19 letter objecting to its contents and the topics upon which we were willing to put up a witness, just so the record is clear.

MS. FISHER:  Right.  But there is no protective order, and there is no motion to limit scope and there's no court ruling.

MS. PROCTOR:  If you have a question --

BY MS. FISHER:

Q     Mr. Zeni, for each system you just named, state its primary function.  So you didn't notate -- you didn't name any systems?

MS. PROCTOR:  Object to the form.  Outside the scope.

Eric Zeni
February 17, 2026

THE WITNESS:  That's correct.  I didn't.

BY MS. FISHER:

Q    Are you prepared to testify today and discuss Virtual Underwriter?

A    Sure.

Q    So is Virtual Underwriter used jointly by Stewart Title Company and Stewart Title Guaranty Company?

MS. PROCTOR:  Objection to it being outside the scope to the extent it's beyond the transaction issue in this complaint.  If he has knowledge, he can answer.

BY MS. FISHER:

Q    Can you answer just yes or no, please?

A    I don't think that's a yes-or-no question.  I'm not here to speak for STC.  I don't know what they use.

Q    So you don't know if Virtual Underwriter is used jointly by Stewart Title Company or Stewart Title Guaranty Company.  Do you know who holds the trademark name to that, to Virtual Underwriter?

MS. PROCTOR:  Objection.  Outside the scope.

Eric Zeni
February 17, 2026

Page 118

THE WITNESS:  Those were a lot of questions.  What's the question?

BY MS. FISHER:

Q     Can you tell me who owns the platform Virtual Underwriter?

A     As I said earlier, I don't know that.

Q     Do you know who holds the registered trademark for the name Virtual Underwriter?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     Does Stewart Title Guaranty maintain an IT system, inventory, or application catalog listing the Virtual Underwriter system through their IT department?

MS. PROCTOR:  Object to the form.  Outside the scope.

THE WITNESS:  I don't understand the question.  I don't know what an IT catalogue -- I don't know what you mean by that.

BY MS. FISHER:

Q     Are you familiar -- do you know if the Stewart Enterprise, SISCO, the subsidiaries, if there is an IT department?

Eric Zeni
February 17, 2026

Page 119

MS. PROCTOR:  Object to form.  Outside the scope.

THE WITNESS:  What subsidiaries?

BY MS. FISHER:

Q    Yourself, Stewart Title Guaranty Company, and Stewart Title Company, do you share the same IT department?

A    I don't know.

Q    You don't know?

A    I just said that.  I don't know.

Q    I'm sorry.  It broke out.  So if I repeat you -- I'm reading your lips, and then I'm repeating what I think you said.  We're on Zoom.

Do you know where Virtual Underwriter is hosted?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  No.

BY MS. FISHER:

Q    Do you know who controls the user provisioning and permissions for the Virtual Underwriting system?

MS. PROCTOR:  Objection.  Form.  Vague. Outside scope.

THE WITNESS:  No.

Eric Zeni
February 17, 2026

Page 120

BY MS. FISHER:

Q       Are there any share platforms used for transmitting title search information from Stewart Title to Stewart Title Guaranty Company?

MS. PROCTOR:  Object to the form. Outside scope.  If he has any information responsive with respect to the transaction at issue in the complaint, he can answer.  If you're asking for something broader than just this transaction, he can answer to the extent he has personal knowledge.

THE WITNESS:  Definitely not with respect to this transaction as STC wasn't involved and, just generally, I'm not aware of any.

BY MS. FISHER:

Q       Okay.  Thank you.  Are there any shared platforms used for transmitting underwriting data?

MS. PROCTOR:  Same objections.  To the extent he has any information regarding the transaction at issue in the complaint, he can answer on behalf of the company.  If he has information of other transactions, he can answer on personal knowledge.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q       So Stewart Information Services,

Eric Zeni
February 17, 2026

Page 121

referred to as SISCO -- and that's S-I-S-C-O -- they don't share the virtual underwriting platform with Stewart Title Guaranty Company?

MS. PROCTOR: Object to the form. Outside the scope.

THE WITNESS: I don't know.

BY MS. FISHER:

Q    Is Virtual Underwriter used by Stewart Title Guaranty Company employees personnel as an underwriter guidance by their actual in-house employees?

MS. PROCTOR: Object to the form. It's out of scope.

THE WITNESS: I'm not sure.

BY MS. FISHER:

Q    Do you know who would know?

A    No.

Q    Does Virtual Underwriter function as an enterprise tool used across the Stewart entities?

MS. PROCTOR: Object to the form. Vague in the use of the phrase "enterprise tool."

THE WITNESS: I don't know what an enterprise tool is. All I know is Virtual Underwriter is a repository of underwriting bulletins and guidelines provided to policy-issuing

Eric Zeni
February 17, 2026

Page 122

offices -- made available -- policy issuing offices.

BY MS. FISHER:

Q    And, Mr. Zeni, who puts out those policies and bulletins?  Who authors them?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  I'm not sure.

BY MS. FISHER:

Q    Your not sure if it's SISCO or Stewart Title Guaranty Company?

MS. PROCTOR:  Same objection.

THE WITNESS:  Someone at STGC, I believe.

BY MS. FISHER:

Q    Can you be verify specific and tell me and identify Virtual Underwriter's role, meaning their guidance, what they transmit regarding their underwriting data, what is it really used for, what kind of tool is it used for?

MS. PROCTOR:  Object to the form. Outside the scope.  If you have personal knowledge, you can answer.

THE WITNESS:  I don't know what you mean by they translate, but, like I said, Virtual Underwriter is a repository of underwriting

Eric Zeni
February 17, 2026

Page 123

bulletins, alerts, guidelines that is made available to policy-issuing offices so they can refer to STGC's underwriting guidelines. It's not interactive. It's something they can go into and review, like a reference guide, essentially.

It doesn't generate forms. It doesn't generate policies. It doesn't do anything independently. It's simply a repository that policy-issuing offices can access for their own reference.

BY MS. FISHER:

Q    Who generates the actual policy once the file is closing?

MS. PROCTOR: Same objection. Outside the scope. He can -- on behalf of STGC, he can answer with respect to the title policy issue in connection with the transaction alleged in the complaint.

THE WITNESS: A policy-issuing office would issue the title policy. Here, it was Gurvey Law Group.

BY MS. FISHER:

Q    But you said Virtual Underwriter doesn't generate the policy. So, I mean, who actually prints out a policy on the Stewart paper,

Eric Zeni
February 17, 2026

Page 124

the actual title policy?  Does that come from an underwriter at Stewart Title Guaranty Company that emails or transmits through the portal the actual policy?

MS. PROCTOR:  Objection to form.  Asked and answered.

THE WITNESS:  No.  I don't know what you mean by portal.  If you're referring to Virtual Underwriter, it absolutely does not come from Virtual Underwriter.  I can't be more explicit about that.  Virtual Underwriter does not generate a thing.  It's at reference tool.  It contains the bulletins and underwriting guidelines and alerts.  That's it.

It doesn't generate anything.  It's not otherwise interactive.  It's simply a reference point.  The policy-issuing office generates a policy and its schedules and endorsements themselves.

BY MS. FISHER:

Q    Thank you.  Do you any idea who controls the domain or the hosting for the Virtual Underwriter system?

MS. PROCTOR:  Object to the form.  Outside the scope.

THE WITNESS:  No.  I said before I

Eric Zeni
February 17, 2026

Page 125

don't know.

BY MS. FISHER:

Q    Okay.  Who has system administrator rights for Virtual Underwriter?

MS. PROCTOR:  Object to the form. Outside the scope and vague.

THE WITNESS:  I don't know.

MS. FISHER:  Ms. Proctor, when you say "vague," would you like me to rephrase the question?

MS. PROCTOR:  Yes.

BY MS. FISHER:

Q    Who -- when I say "system administrator rights for Virtual Underwriter," who can go in and change the policies and procedures?  Who can make adjustments to the Virtual Underwriting system or add bulletins or take away bulletins, take away policies, add policies, things of that nature?

MS. PROCTOR:  I withdraw my vague objection.  Still, I'm objecting to it on the basis of outside the scope.  He can answer, if he has any personal knowledge.

THE WITNESS:  I don't know.  I believe the underwriting department, but I don't know who specifically.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 126

Q      Does Virtual Underwriter have a published privacy policy associated with the Virtual Underwriter site or Stewart sites used for Virtual Underwriter?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q      Mr. Zeni, do you know who the records custodian or the department for the Virtual Underwriter documents, such as the privacy policy publication history would be?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q      Do you know who would know?  Could you point me in that direction?  Who would know about the Virtual Underwriter system?

MS. PROCTOR:  Scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q      Do you have any idea if the organization that administers the Virtual Underwriter also controlled the publication of the

Eric Zeni
February 17, 2026

Page 127

Virtual Underwriter materials in the platform?

MS. PROCTOR: Objection. Outside the scope. Form.

THE WITNESS: I don't know.

BY MS. FISHER:

Q    And you don't have any idea who would?

A    No.

Q    Could it be the underwriting department?

A    I don't know.

Q    Do you think it could be SISCO?

A    No.

Q    Does SISCO have any employees?

MS. PROCTOR: Objection. Way outside scope. He's here as a corporate rep for Stewart Title Guaranty Company, not as a corporate rep for SISCO.

MS. FISHER: I understand that, Ms. Proctor, but I'm asking because Mr. Zeni has no knowledge really of the Virtual Underwriting platform, so I'm asking, would it be SISCO employees that have that information. A lot of their bulletins are signed by SISCO.

MS. PROCTOR: Okay. I'm just noting my objection for the record. You're mischaracterizing

Eric Zeni
February 17, 2026

Page 128

his testimony. He's testified at length as to what Virtual Underwriter is and what it is not. You asked him if SISCO, an entirely separate company, has employees, and I'm just making a record that that's outside the scope of the noticed topics, even under your original notice.

But if he has any personal knowledge of how many employees SISCO has, he can answer that question.

THE WITNESS: I don't know.

BY MS. FISHER:

Q I don't want to know how many employees they have. I just want to know if they actually have the parent company of Stewart Title Guaranty Company, which is SISCO; correct?

MS. PROCTOR: Again. Outside the scope. If he has any knowledge, personal knowledge, he can answer.

THE WITNESS: I don't know if SISCO has any employees.

BY MS. FISHER:

Q Okay. Is SISCO the parent company to Stewart Title Guaranty Company?

MS. PROCTOR: I'm objecting to it being outside the scope.

Eric Zeni
February 17, 2026

Page 129

THE WITNESS:  My understanding is that SISCO owns 100 percent of the shares of stock of STGC.

BY MS. FISHER:

Q   Would that make them the parent company?

MS. PROCTOR:  Objection.  Calls for a legal conclusion, and it's outside the scope.

MS. GILROY:  Also calls for speculation.

THE WITNESS:  I don't know how to answer that.  I gave you my answer.  It owns, to my knowledge, 100 percent of the share of STGC.

BY MS. FISHER:

Q   Okay.  Do you know who would be responsible for maintaining and editing the content of Virtual Underwriter, had once it's published, the department?

MS. PROCTOR:  Objection.  Outside the scope.  Asked and answered.

THE WITNESS:  Like I said earlier, I don't know, but I would think maybe underwriting.

BY MS. FISHER:

Q   Did you have any idea who would have privilege to publish, edit, or remove Virtual

Eric Zeni
February 17, 2026

Page 130

Underwriting content?  Do you think it would be underwriting?

MS. PROCTOR:  Objection.  It's a compound question.  Form.

BY MS. FISHER:

Q    Would you like me to rephrase the question, Mr. Zeni?

A    Sure.

Q    Who has privileges to publish Virtual Underwriting content?

MS. PROCTOR:  Objection.  Outside scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Are you aware if Virtual Underwriting has any representation in their manuals that information collected through the Stewart sites, including Virtual Underwriter, may be used to prevent fraud or fraudulent transactions?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  I'm not sure.  I don't know.

BY MS. FISHER:

Q    Do you have any idea who inside the

Eric Zeni
February 17, 2026

Page 131

organization would know?

A   No.

Q   Do you know what process-level controls exist in Virtual Underwriter?

MS. PROCTOR:  Objection to the form. Vague in its use of "process-level controls."  Also outside the scope.

THE WITNESS:  I don't know what you mean by "process-level controls."

BY MS. FISHER:

Q   I mean systems intended to detect or prevent fraudulent transactions from occurring.

MS. PROCTOR:  Object to the form.

BY MS. FISHER:

Q   Wait, let me -- can I be more specific? I know Virtual Underwriter has in their system where they can run to see if a buyer -- they can run a name search.  The Virtual Underwriter, you can run a name search for the United States Patriot Act.  Are you familiar with that?

MS. PROCTOR:  Again, I'm going to object as being outside the scope and object to the form of the question.

THE WITNESS:  No.  I think you're incorrect.  I don't believe you can do a Patriot Act

Eric Zeni
February 17, 2026

Page 132

search through Virtual Underwriter.  It's not a
search tool.  It's not a title search tool.  It's
not a Patriot Act search tool.  It's not anything of
the sort.  It's just a repository of underwriting
guidelines.

BY MS. FISHER:

Q      So you don't believe the Patriot Act is
a part of the underwriting guidelines under ALTA?

MS. PROCTOR:  Objection.  Misstates his
testimony and object to the form and outside the
scope.

MS. GILROY:  And STC joins.

THE WITNESS:  That's not the question
you asked me and that is not what I said.

BY MS. FISHER:

Q      Can you repeat what you said about the
Patriot Act in regards to underwriting?

A      No.  The court reporter can, please.

Q      It's fine.  She got that on the record.
Does Stewart Title Guaranty Company have a
standalone IT department?

MS. PROCTOR:  Objection.  Outside the
scope.

THE WITNESS:  I don't know what you
mean by "standalone."  I know that STGC has an IT

Page 133

department.

BY MS. FISHER:

Q      Just that services Stewart Title Guaranty Company, is what I mean by "standalone."

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  I -- I'm not aware of what exactly they do.  I know that STGC has an IT department.

BY MS. FISHER:

Q      Thank you.  Where is that IT department housed?  Is that out of your New York office, or is that out of the Houston office for Stewart Title Guaranty Company?

MS. PROCTOR:  Objection to the scope.

THE WITNESS:  I'm not sure where it's housed.

BY MS. FISHER:

Q      Okay.  Let's move to No. 8, Topic 8.  I want to discuss Stewart Title Guaranty Company's financial relationship and reporting structure under SISCO -- that's -- SISCO -- including the premium allocation, the revenue sharing, the remittance procedures related to Stewart Title Company's originated transactions.

Eric Zeni
February 17, 2026

Page 134

MS. PROCTOR: For the record, we objected to putting up a witness on this topic for the reasons set forth in my letter January 19, 2026.

MS. FISHER: And, for the record, there's no court order or stipulation order.

BY MS. FISHER:

Q So if you just want to answer yes or no to my questions, that's fine.

MS. PROCTOR: And he would be doing so based on personal knowledge because he's not here as a corporate representative on this topic.

MS. FISHER: And, for the record, again, there's no court order precluding Mr. Zeni from testifying on these topics.

MS. PROCTOR: Correct, but he's doing so in his -- the witness's personal knowledge. He's not here as a corporate rep on this topic.

MS. FISHER: For the record, I didn't depose him has personal witness. He's deposed as a 30(b)(6) witness.

MS. PROCTOR: My objection is noted for the record. If you have a question, please ask it.

BY MS. FISHER:

Q Mr. Zeni, in a Stewart Title Guaranty-originated transaction insured by Stewart

Eric Zeni
February 17, 2026

Page 135

Title Guaranty, could you identify each category of money involved, regarding the premiums, et cetera, endorsement charges, policies premium charges?

MS. PROCTOR:  Object to the form.  Way outside the scope.  If he has any personal knowledge, he can answer.

THE WITNESS:  I don't understand the question, but I'm just going to note that the basis STGC originated -- STGC is not originating transactions.  Its policy-issuing offices are issuing policies on its behalf.  As to the remainder of your question, I really don't understand it.

BY MS. FISHER:

Q    So when the premium's paid for the policy, does that get paid to Stewart Title Guaranty Company, or does the issuing agent office hold that money?

MS. PROCTOR:  Objection.  Outside the scope.  If he has any information regarding the transaction at issue in this complaint, he can answer on behalf of the company.

THE WITNESS:  I don't recall with respect to this particular transaction.  Generally, the invoice is issued by the policy-issuing office, a title invoice for the transaction.  And --

Eric Zeni
February 17, 2026

Page 136

BY MS. FISHER:

Q      And does the --

A      -- to -- as to the remainder of your question, I really don't know.

Q      So you don't know if the issuing office then, in turn, paid the premium policy fee to Stewart Title Guaranty Company?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  The policy-issuing office, my understanding is, remits STGC's portion of the premium.  As to the logistics or mechanics or procedures, I don't know.

BY MS. FISHER:

Q      SISCO reports those premiums on the 10K.  This is why I'm asking you that, the remittance of these premiums, if they're sent to Stewart Title Guaranty Company, but your position is you don't know?

MS. PROCTOR:  Objection. Mischaracterizes his testimony.

THE WITNESS:  That's not what I said. I said the policy issuing office remits the applicable portion of the premium to STGC.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 137

Q     Thank you.  Is the allocation applied automatically by a system or manually?

MS. PROCTOR:  Objection to the form. Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     What data fields drive the allocation?

MS. PROCTOR:  Same objections.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q     Do you know if the allocation record is named as the system of record?

MS. PROCTOR:  Objection to form. Vague, ambiguous, and outside the scope.

THE WITNESS:  I don't know what you're asking me.

BY MS. FISHER:

Q     Do you know what portion is remitted and how it is calculated or if the closing office gets a percentage of the premium?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  I don't know.  I think every transaction is different, every issuing office -- it -- it would be transaction specific.

Eric Zeni
February 17, 2026

BY MS. FISHER:

Q    So it's not a situation where it's contract specific where an issuing office would get a kickback or a percentage of the premium?

MS. PROCTOR:  Same objection.

MS. GILROY:  I would object as to form.

THE WITNESS:  I don't know anything about kickbacks.  Issuing offices have underwriting agreements with STGC that would govern the relationship between the two entities.  And as to calculation or premiums and charges and the like, that is transaction specific and would vary transaction by transaction.

BY MS. FISHER:

Q    So with that being said, would the issuing office get a percentage of that?

MS. PROCTOR:  Objection.

THE WITNESS:  It would depend on the underwriting agreement, the issuing office, and STGC.

BY MS. FISHER:

Q    Thank you.  Do you know if Stewart Title Guaranty Company has an agreement like that with Gurvey in place where Gurvey is set to get a percentage of the title premium policies?

Page 139

MS. PROCTOR:  Same objection.

THE WITNESS:  I believe there's an underwriting agreement in place or at least was with Gurvey.  I don't recall the details, so if you would like to show it to me and refresh my recollection, I'd be happy to take a look at it.

BY MS. FISHER:

Q    Is Stewart Title Guaranty Company still contracted with Gurvey?

MS. PROCTOR:  Outside the scope.  He can answer if he has personal knowledge.

THE WITNESS:  I don't recall.

BY MS. FISHER:

Q    Can you tell me which entity receives the remitted amount?  Is that Stewart Title Company or the guaranty company?

MS. PROCTOR:  Outside the scope.

THE WITNESS:  The amount remitted by who?

BY MS. FISHER:

Q    When a policy premium is paid, when an endorsement is paid, anything related to the policy. When the closing --

A    I --

Q    Sorry.  When the closing agent closes

Eric Zeni
February 17, 2026

Page 140

the file and the guaranty company title fee, the check is cut, and its remitted, is that remitted to Stewart Title Guaranty Company?

A    Yes, it would go to STGC.  You asked earlier, I believe, about STC.  It would absolutely not go to STC.  Like I said earlier this morning, STC is a wholly-owned issuing office owned by STGC, so it would not have anything to do with independent agents of STGC.

Q    Who is the custodian or department of the remittance records at Stewart Title Guaranty Company?

MS. PROCTOR:  Object.  Outside the scope.

THE WITNESS:  Specifically, I don't know.  Probably the agency department.

BY MS. FISHER:

Q    The agency department?

A    I believe so.

Q    Is that the same as an accounting department?

MS. PROCTOR:  Same objection.

THE WITNESS:  No.

BY MS. FISHER:

Q    Where is that agency department

Eric Zeni
February 17, 2026

Page 141

located?

A    I don't know that it has a single location.  It's located throughout the country.

Q    Can you describe Stewart Title Guaranty Company's financial reporting structure under the SISCO umbrella?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  No.

BY MS. FISHER:

Q    Do you know who can?

A    I do not.

Q    Does Stewart Title Guaranty Company report premium revenue up to SISCO?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  I don't know.

BY MS. FISHER:

Q    Do you have any idea who would know?

A    I do not.

Q    Do you know who at SISCO would receive the accounting reports from the guaranty company?

MS. PROCTOR:  Objection.  Outside the scope.  He's not here to testify on behalf of SISCO, and it's outside the scope of the notice --

Eric Zeni
February 17, 2026

Page 142

MS. FISHER: Would you like me to rephrase the question? I'm not asking on behalf of SISCO. I want to know who does the guaranty company send their annually or quarterly reporting where SISCO reports to the public?

MS. PROCTOR: I -- I'm still going to object to it being outside the scope. He's not here to testify on Topic No. 8, and it's in no way related to the transactions alleged in the complaint. If he has any personal knowledge, he can answer.

THE WITNESS: I don't know.

BY MS. FISHER:

**Q      And for the record, a part of the premium that derived from my transaction was and did go to SISCO. That's why I'm asking that question.**

MS. PROCTOR: Have you produced those records in response to STGC's discovery request?

MS. FISHER: It's all reported through SISCO's annual reporting through the 10K and also to the SEC.

MS. PROCTOR: Well, you have an obligation to produce to us all the documents you were going to use to -- in this case. So to the extent you're asking this question about -- this

Eric Zeni
February 17, 2026

Page 143

witness about documents you have not produced, I object.

MS. FISHER:  It's public record.

THE WITNESS:  Just noting my objection for the record.

BY MS. FISHER:

Q    Mr. Zeni, are there distinct accounts or cost centers used to track revenue associated with Stewart Title Guaranty Company's originated transaction?

MS. PROCTOR:  Objection to the form, particular in the use of "STGC originated transactions," so I'm going to object to it being way outside the scope.  He can answer, if he has any personal knowledge.

THE WITNESS:  I don't.

BY MS. FISHER:

Q    Do you know if any premium allocation, revenue sharing are governed by written policies?

MS. PROCTOR:  Objection.  Outside the scope.

THE WITNESS:  I don't know.

MS. FISHER:  Amanda, I'm going to go ahead and start emailing you exhibits.

MS. PROCTOR:  Okay.

Eric Zeni
February 17, 2026

Page 144

MS. FISHER:  Are you ready with your laptop?

MS. PROCTOR:  I am.

MS. FISHER:  Okay.  Perfect.  Thank you for sharing that -- sharing these.

And the court reporter, can you start marking exhibits for the record as we go through them?

MS. PROCTOR:  I think she already has 1.  I think your notice of deposition was an exhibit; right?

MS. FISHER:  Yeah.  You have all of them.  Did it come through?

MS. PROCTOR:  Paula, did you send it? I still don't have anything.

MS. FISHER:  I did.  Where did Mr. Zeni go?

MS. PROCTOR:  He just took a two-minute break while we wait for this email to come through.

THE COURT REPORTER:  Do you-all want to go off the record?

MS. PROCTOR:  I'll call him back in here as soon as I get it.

THE COURT REPORTER:  Did you want to go off the record real quick?

Eric Zeni
February 17, 2026

Page 145

MS. FISHER:  No, because the exhibit is out.

THE COURT REPORTER:  Okay.

MS. FISHER:  Would it be easier, Kate, for you to show them if you're not typing and as we introduce them, moving forward though?

THE COURT REPORTER:  It's whatever you need me to do.  Like I said, it will just take me a minute.  I can't share and have my hands on the keys at the same time, but I'm happy to do that.  I have them all here, and I'm happy to share the screen.

I can also give permissions so somebody can manipulate the document.  Like I can give you permission and you scroll through for him, or he can.

MS. FISHER:  Okay.  Got it.  Did you get it, Ms. Proctor?

MS. PROCTOR:  I did.  Please, call me Mandy, Paula.

MS. FISHER:  Oh, okay.

MS. PROCTOR:  We're on a first-name basis.

MS. FISHER:  I know, but for the record...

THE COURT REPORTER:  Do you want me to

Eric Zeni
February 17, 2026

Page 146

try to email them?

MS. FISHER:  No.  It's okay.  I think she got them.

THE COURT REPORTER:  Good.  Okay.

MS. PROCTOR:  Are we expecting more than one?

MS. FISHER:  No.  The -- that's what I emailed you.  Could you put that up on the screen for us and call Mr. Zeni back in, please?

MS. PROCTOR:  Yes.  We are finding Mr. Zeni, and I am putting it up on the screen now. You can either look at it on this screen or right here, whatever is easiest for you.

(Whereupon a document was identified as Plaintiff's Exhibit 2.)

BY MS. FISHER:

Q    Mr. Zeni, can you confirm this was the official letter from the government agency of Office of the Commissioner of Insurance?  Yes or no, please.

A    Yeah.  It looks like the complaint we received from the department of insurance.

MS. FISHER:  Mandy, can you scroll down -- no, could you scroll down to Bates No. 54, Stewart Title Guaranty Company No. 54?  This one

Eric Zeni
February 17, 2026

Page 147

right here.

BY MS. FISHER:

Q    Mr. Zeni, Bates range page 54, can you read for the record the Complaint Details where -- the type description of the complaint, the detail of the complaint, and what -- the plaintiff would be considered to be a fair resolution?

A    Yeah.  I read it.

Q    Do you agree where I describe in the complaint "fraud - transfer real property"?

A    No.

Q    No?  There's an asterisk red star right next to it.

MS. PROCTOR:  Just for the record, Paula, the version that we produced to you of STGC_000054 did not have a red asterisk.  Did you add those?

MS. FISHER:  Yes, I did for the deposition, so we wouldn't have to waste our time to read the full documents.

MS. PROCTOR:  Understood.  I just wanted the record to be clear that that was not -- those asterisks were not part of STGC's production. They were added later.

MS. FISHER:  Yes.  I put the red

Eric Zeni
February 17, 2026

Page 148

asterisks.

MS. PROCTOR:  Thank you.

BY MS. FISHER:

Q      So, Mr. Zeni, as a part of the complaint that I submitted to the insurance commissioner, could we agree that I had put a type of description of the complaint was for "fraud - transfer of real property"?

A      I see that.

Q      And the details of the complaint, "Title company failed to properly perform due diligence and assisted in the fraudulent transfer of the title of my real property."

A      I see that.

Q      Then their complaint form states, "Describe what you would think would be a fair resolution to your complaint."

I wrote, "Undo the sale and fraudulent transfer and hold the title company accountable."

A      Okay.

Q      Would you we agree that your offices, Stewart Title Guaranty Company, received this complaint?

A      Yes, it was received.

Q      On December 13 of 2024?

Eric Zeni
February 17, 2026

Page 149

A    I don't know the date it was received.

MS. FISHER:  Can you scroll up, Mandy, to the beginning of the letter?

BY MS. FISHER:

Q    It was December 13, 2024; correct?

A    Well, it's dated December 13, 2024.  I don't know when it was received.

MS. FISHER:  Okay.  Mandy, can you scroll down to Exhibit 3, please?

(Whereupon a document was identified as Plaintiff's Exhibit 3.)

BY MS. FISHER:

Q    Mr. Zeni, you authorized Stewart Title Guaranty Company's December 18, 2024, letter to the Georgia Department of Insurance; correct?

MS. PROCTOR:  Object to the form.

THE WITNESS:  I authored the response, yes.

BY MS. FISHER:

Q    The fourth paragraph, the very last sentence, you authored and wrote, "Stewart Title Guaranty Company must therefore decline Fisher's suggested fair resolution of the complaint."  Was this written by you?

A    Yes.

Eric Zeni
February 17, 2026

Page 150

Q    Thank you.

(Whereupon a document was identified as Plaintiff's Exhibit 4.)

MS. FISHER:  Okay.  Mandy, I'm going to send you Exhibit No. 4.  Did you receive it?

MS. PROCTOR:  I did not.  I have it now.

MS. FISHER:  Thank you.  Can you share it on the screen, please?

BY MS. FISHER:

Q    Mr. Zeni, you authored, on behalf of Stewart Title Guaranty Company, a January 21, 2025, letter to the Georgia Department of Insurance; correct?

A    Yes.

Q    For the record, if you scroll down to Bates range page 226, Mr. Zeni, can you just confirm that you wrote these statements?

A    I wrote --

Q    The rebuttal -- pardon me?

A    I wrote everything on these pages.

Q    Okay.  For the record, "The Rebuttal's central (and faulty) premises is that a fraud has occurred.  This has not been established."  Then in the third paragraph, it states, "Not only Fisher not

Eric Zeni
February 17, 2026

Page 151

[sic] an insured of Stewart Title Guaranty Company,
but the matter she complains of does not implicate
any covered risk....It is unclear what harm Fisher
has suffered here."

          Those letters -- this letter
specifically, January 21, 2025, that letter states
Stewart Title Guaranty Company's official position
to a state regulator; correct?

          MS. PROCTOR:  Object to form.

          THE WITNESS:  This is our response to
the correspondence from the department of insurance.
BY MS. FISHER:

     Q     Thank you.

          MS. PROCTOR:  And just for the record,
Exhibit 4, Bates page 226 -- ending in 226 contains
underlining and the red asterisk -- Paula, for the
record, did you add the edits --

          MS. FISHER:  Yes, I did for time
efficiency.  You told me Mr. Zeni needed to get on a
plane early, so I didn't want us to have to read
through the whole letter.

          MS. PROCTOR:  I really do appreciate
that.

          MS. FISHER:  But yes.

          MS. PROCTOR:  I just want the record to

Eric Zeni
February 17, 2026

Page 152

be clear.

MS. FISHER:  Yeah.  For the record, all these exhibits are from discovery that Stewart Title Guaranty Company produced.  I just want on the record for accuracy for the Court.

(Whereupon documents were identified as Plaintiff's Exhibit 5 and Plaintiff's Exhibit 6.)

MS. FISHER:  Okay.  Now I'm sending you 5 and 6, Mandy.

MS. PROCTOR:  I just received it.

MS. FISHER:  Thank you so much.  Could you throw that up on the screen?  This is Bates range 230, Exhibit 5 -- marked as Exhibit 5.

BY MS. FISHER:

Q     Mr. Zeni, up at the very top, it says Stewart ALTA Owner's Policy of Title Insurance, July 1, 2021, issued by Stewart Title Guaranty Company; is that correct?

A     That's what it says.

Q     Then, down towards the bottom where the seal is on the right-hand side, Frederick Eppinger, President and CEO.  Is he the president and CEO of Stewart Title Guaranty Company?

MS. PROCTOR:  Objection.  Outside the

Eric Zeni
February 17, 2026

Page 153

scope.

THE WITNESS:  I believe so.

BY MS. FISHER:

Q       Is he also the President and CEO for SISCO?

MS. PROCTOR:  Same objection.

BY MS. FISHER:

Q       On the same Exhibit 5, under 2(a)(i), it says, "Any defect or lien or encumbrance on Title.  Covered Risk 2 includes, but is not limited to, insurance loss from a defect in the title caused by forgery, fraud, undue influence, duress, incompetency, incapacity" -- how do you say that? Incapacity?  -- "or impersonation."  Is that correct?

A       That's what it states.

Q       Thank you for confirming that.

MS. FISHER:  Mandy, can you scroll down to Exhibit 6, please.

BY MS. FISHER:

Q       So Schedule A of Stewart Title Guaranty's policy, it states "The Title is vested in Catalyst REI, LLC, a Florida Limited Liability Company."  Correct?

A       That's what it states on the document.

Eric Zeni
February 17, 2026

Page 154

Q      And the policy defines an entity to include a limited liability company; correct?

MS. PROCTOR:  Can you repeat the question, Paula?

MS. FISHER:  Yes, ma'am.

BY MS. FISHER:

Q      "A policy defines an entity to include a limited liability company."  Correct?

MS. PROCTOR:  Object to the form.  The policy speaks for itself.

THE WITNESS:  Yeah.  I don't know.  You would have to look at the definition section on the policy.

BY MS. FISHER:

Q      The policy definition of entity requires it to be authorized by law to own title in the state where the land is located; correct?

MS. PROCTOR:  Object to the form.  The policy speaks for itself.

It's only two pages.

THE WITNESS:  I don't see the policy's definition here, so I can't answer your question.

BY MS. FISHER:

Q      Okay.  Are you familiar with the policy?  Earlier, at the beginning of the

Eric Zeni
February 17, 2026

Page 155

deposition, you were very familiar citing sections out of the policy, but you're not familiar with the policy definitions now?

MS. PROCTOR: Object to form of the question. If you want to show him the whole policy, that would be helpful. Otherwise. I'm just going to object to the form.

MS. FISHER: Are you able to pull up the Bates ranges?

MS. PROCTOR: I don't have the exhibits ready today. That...

MS. FISHER: Oh, okay. Early on I asked you if you would like to have the Bates range exhibits. That's fine. We can move along.

BY MS. FISHER:

Q    Georgia is the state where the land in this transaction is located; correct?

A    Yes.

Q    And under covered risks in the policy include loss caused by "the failure or a person or Entity to have authorized a transfer or conveyance." Correct?

MS. PROCTOR: Are you reading from the exhibit, Paula? If so --

MS. FISHER: Yeah. Go to Bates range

Eric Zeni
February 17, 2026

Page 156

230 under Covered Risk.

MS. PROCTOR:  Gotcha.  I wanted today make sure he could read see what you're reading from.

MS. FISHER:  2(a)(ii).

THE WITNESS:  What's your question?

BY MS. FISHER:

Q     Covered risks in the policy include loss caused by "the failure of a person or entity to have authorized a transfer or conveyance."  Correct?

A     That's what 2(a)(ii) says.

Q     Thank you.  And can you confirm that this policy was signed and ratified by Frederick Eppinger -- is actually the president and CEO of the Stewart enterprise SISCO?

MS. PROCTOR:  Object to the form. Outside the scope.

THE WITNESS:  I'm not sure what SISCO has to do with it, but Mr. Eppinger's signature is there on the screen.

BY MS. FISHER:

Q     Well, if he is the CEO and president of SISCO, he's signing off on policies where entities don't exist, so it -- SISCO is very relevant to this.

Eric Zeni
February 17, 2026

Page 157

MS. PROCTOR:  Is there a question?

BY MS. FISHER:

Q     The Gurvey Law Group is not the insurer that issued the ALTA policy; correct?  It's Stewart Title Company -- Stewart Title Guaranty Company.

MS. PROCTOR:  Objection as -- form.

BY MS. FISHER:

Q     On Exhibit 5, it says Stewart ALTA Owner's Policy of Title Insurance issued by Stewart Title Guaranty Company; is that correct?

MS. PROCTOR:  So I told you before I don't know if Mr. Eppinger -- what his role, if any, is with SISCO.  I believe he's the CEO of STGC.  And, as I said many times today, Gurvey Law Group issued this policy itself as a limited policy-issuing agent of STGC.

BY MS. FISHER:

Q     But Gurvey Law Group, they did not author Stewart Title Guaranty Company's covered risk section.  That was authored by Stewart Title Guaranty Company; correct?

MS. PROCTOR:  Object to the form.

THE WITNESS:  No.  It was authored by ALTA.

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 158

Q      And Gurvey Law Group did not control what Stewart Title Guaranty Company wrote in Schedule A about the vesting; correct?

MS. PROCTOR:  Object to form.

THE WITNESS:  I'm -- I'm sorry. Restate the question, please.

BY MS. FISHER:

Q      Gurvey Law Group did not control what Stewart Title Guaranty Company wrote in Schedule A about the vesting; correct?

MS. PROCTOR:  Object to the form.

THE WITNESS:  No.

I'm sorry.

MS. PROCTOR:  That's it.

BY MS. FISHER:

Q      Thank you.

A      Absolutely incorrect.  You're wrong. Gurvey Law Group prepared Schedule A.  STGC did not prepare Schedule A in the policy.

Q      Thank you.  And even if a closing attorney uses "subject to" forms, Stewart Title Guaranty Company still chooses whether to issue a policy and who to name it as the invested owner; correct?

MS. PROCTOR:  Object to the form.

Eric Zeni
February 17, 2026

Page 159

Vague and ambiguous, particularly, but not limited to, the use of "subject two forms." And I'm going to object to it being outside the scope. But he can answer, if he understands your question and has personal knowledge.

THE WITNESS: I do not understand the question.

BY MS. FISHER:

Q Stewart Title Guaranty Company has the final say whether to issue a policy and who to name as the vested owner; correct?

MS. PROCTOR: Same objections. I'm sorry. Object to form. Vague, as you said "vested owner," and also states facts not in evidence.

THE WITNESS: I really don't think you're understanding this. Stewart Title Guaranty Company appoints agents. It has limited policy-issuing agents for the sole purpose of issuing title insurance policies in STGC's name. Those agents, duly appointed, are enabled and permitted to issue policies in STGC's name.

BY MS. FISHER:

Q Sir, I do understand. I'm following the paper trail.

A Not well.

Eric Zeni
February 17, 2026

Page 160

Q    The ALTA policy issued by Stewart Title Guaranty Company is dated April 1, 2024; correct?

MS. PROCTOR:  What Bates page are you looking at, Paula?

MS. FISHER:  I am looking at 94, Exhibit 6.

MS. PROCTOR:  Thank you.

BY MS. FISHER:

Q    It's under Schedule A where it says Name and Address of the Insurance Company:  Stewart Title Guaranty company, Policy Number, Amount of Insurance, and the date of the policy; April 1, 2024, 1:35 p.m.

Can you confirm that, please, Mr. Zeni, that the date of the issuance of this policy was April 1, 2024?

A    That's the date of policy.

Q    Okay.  The closing occurred on April 2, 2024.  The warranty deed was recorded on April 10, 2024, nine days after the closing.  So as of April 1, the deed had not been yet reported; correct?

MS. PROCTOR:  Objection.  Incomplete hypothetical.  You're talking about evidence that's not -- facts that have not been put into evidence, and this witness has no foundation to accept the

Eric Zeni
February 17, 2026

Page 161

premise of your question.

BY MS. FISHER:

Q    Okay.  We'll go back to that once I show the warranty deed, but the warranty deed is in the Bates-range pages.  Stewart Title Company -- Stewart Title Guaranty Company would not issue a policy unless it intended to insure the vesting shown on Schedule A; correct?

MS. PROCTOR:  Object to form.  The policy speaks for itself.

THE WITNESS:  Once again, I'll repeat: STGC didn't issue this.  Gurvey Law did.

BY MS. FISHER:

Q    So per underwriting guidelines and ALTA, that you mentioned earlier, on April 1, Stewart Title Guaranty Company had not yet relied on a recorded deed to confirm vesting, but it still chose to ratify a closing by insuring and issuing a policy to Catalyst REI, LLC, which, clearly, has, on the title insurance policy, a Florida limited liability company.

So any decision to ensure Catalyst REI depended on a nonrecorded source in Stewart Title Guaranty Company's underwriting systems?

MS. PROCTOR:  I'm going to object to

Eric Zeni
February 17, 2026

Page 162

this question because the plaintiff is testifying, and I'm going to object because it assumes facts not in evidence, mainly that STGC somehow ratified the closing.  I'm going to object to it being compound and vague and ambiguous.  If the witness understood the question, he may answer.

THE WITNESS:  I didn't know that was a question.  No, I don't understand.

BY MS. FISHER:

Q    The question is:  Any decision to insure Catalyst REI, LLC, was it dependent on a nonrecorded source?

MS. PROCTOR:  Objection to the form. Also, outside the scope as this policy was issued by the Gurvey Law Group.  If he has any knowledge, he can...

THE WITNESS:  Yeah.  STGC didn't issue this, as I've said numerous times already.  STGC doesn't conduct settlement or closings.  Gurvey Law Group issues policies and conducts closing.  STGC has no part of that.  It doesn't ratify if after the fact.  Gurvey, as limited policy-issuing agent, issued the policy in STGC's name, and I have no knowledge of when the deed was recorded.  No -- and that's that.

Eric Zeni
February 17, 2026

Page 163

BY MS. FISHER:

Q    Okay.  Mr. Zeni, so can you confirm or deny if there is a underwriting file that exists within Stewart Title Guaranty Company?

A    With respect to this transaction?

Q    Yes.

A    There is a over-limits request that was received and then an over-limits approval that was sent.

Q    No.  I'm asking if there is a underwriting file that exists within the Stewart Title Guaranty Company.

MS. PROCTOR:  Object to the form.  He's asked and answered that question.

BY MS. FISHER:

Q    Can you repeat your --

A    There is no underwriting file because STGC did not underwrite the transaction.  That was Gurvey Law's responsibility.  The extent of STGC's file with respect to this transaction is the over-limits request and the conditional approval that was issued to Gurvey Law Group.

Q    Okay.  So the only thing that you're stating that Stewart Title Guaranty Company would be in possession of is the over-limit form?

Eric Zeni
February 17, 2026

Page 164

MS. PROCTOR:  Objection.  Misstates his testimony.

BY MS. FISHER:

Q    Could you repeat that?  What would Stewart Title Guaranty Company have in its possession regarding this?  You mentioned the over-limit form.

A    I said STGC did not conduct the underwriting on this transaction.  That was all done by Gurvey.  And STGC would only have the over-limits approval request and the conditional approval that was issued to Gurvey Law Group.

(Whereupon documents were identified as Plaintiff's Exhibit 7 and Plaintiff's Exhibit 8.)

MS. FISHER:  Okay.  Mandy, I'm sending you Exhibit 7 -- Exhibit 7 and Exhibit 8.

MS. PROCTOR:  Received.

MS. FISHER:  Thank you.  Can you throw it up on the screen, please?

BY MS. FISHER:

Q    Mr. Zeni, Exhibit 7, here is an email from Claim Counsel Marimar Soltero.  Can you tell me who conducted the secondary review that she's referring to?  December 13, 2024, she writes, "Good

Eric Zeni
February 17, 2026

Page 165

morning, Paula.  The claim is still undergoing the secondary review."

Do you have any idea who that person was?

MS. PROCTOR:  He's already responded to that.

MS. FISHER:  Oh, it broke out.

MS. PROCTOR:  Okay.  Go ahead.

THE WITNESS:  Yeah.  That was me.

MS. FISHER:  Could you please scroll down, Mandy, to Exhibit 8?  Okay.  Right there. Thank you.  Can you just -- right there is perfect.

BY MS. FISHER:

Q    Here's a series of documents produced in discovery by Stewart Title Guaranty Company.  Up at the top where I underlined in red, it says November 14 of 2024.  Can you tell me what initiated this investigation?

MS. PROCTOR:  Object to the form.  It's not clear that this document corresponds with any investigation.  If he has any knowledge, he can answer.

THE WITNESS:  I don't know what investigation you're talking about.  This is a document that was provided to STGC by Gurvey Law --

Eric Zeni
February 17, 2026

Page 166

from Gurvey's file.

BY MS. FISHER:

Q    Thank you for clarifying that.  And that was November 14, 2024?

MS. PROCTOR:  Object to the form. Calls for speculation as to the significance of the date.

THE WITNESS:  I don't know what the purpose of the date is, what that signifies.

BY MS. FISHER:

Q    Well, to me, it signifies that there was clear knowledge, in November of 2024, and today we sit here February of 2026.  If you scroll through these pages, you can see clearly what these buyers do, Mr. Zeni.  On Bates --

MS. PROCTOR:  I'm going to object to Plaintiff testifying -- hold on.  I'm going to object because Plaintiff is testifying.  You may proceed with your questions.

BY MS. FISHER:

Q    On page 609, Bates range 609, Mr. Zeni, have you even seen these?  To be fair, I want to ask you.

MS. PROCTOR:  I don't see that Bates number in these exhibits.  Oh, there -- I'm sorry.

Eric Zeni
February 17, 2026

MS. FISHER:  Right here.

BY MS. FISHER:

Q     Mr. Zeni, have you even seen these, to be fair?

A     Yes.  They are a part of our document production.

Q     Okay.  So these people go by several different names.  You can see what they do.  In several places here, you could see they do sub-to transactions, which is what this Gurvey Law Group office specializes in.  If you go to scroll through, you can see several other homes that they've done.

So when this was brought to Stewart Title Guaranty Company, there was no curative action plan?  You didn't think to look further into the transaction and what harm that they did to me?

MS. PROCTOR:  I'm going to object to this monologue because you're testifying, and that's not proper.  And so I'm going to lodge my objection to that, and I'm also going to object to the question as being argumentative.  If the witness has any further response, he can answer.

THE WITNESS:  So I don't know anything about Catalyst group.  I don't know what their business is.  This was provided to us as part of the

Eric Zeni
February 17, 2026

Page 168

claim file.  It was provided from Gurvey Law Group. This is not prior thereto in STGC's possession. It's not something we generated or did ourselves. And to your question about curative, I go back to what I said earlier today.  Your claim was denied because you're not our insured.

We don't owe any duty to you to do any sort of curative action.  We have no duty to our insured.  And if the grantee, the purchaser, that received the policy was not properly formed, then that is their fault.  And, as I said earlier several times, that would not be covered under Exclusion 3A.

So I don't see any set of facts here under any circumstance that STGC would owe any reason to conduct a curative action.

Q    **You say that, even with SISCO's president and CEO signing off on this policy.**

MS. PROCTOR:  Object to the form. Assumes facts not in evidence.

MS. FISHER:  Mandy, I'm sending you the next set of exhibits.

THE WITNESS:  Is that a question?

MS. PROCTOR:  Yes.  Do you want to answer it, subject to my objections?

THE WITNESS:  My answer, if that was a

Eric Zeni
February 17, 2026

Page 169

question, would be that Gurvey Law Group, as I said numerous times, issued the policy. STGC did not.

BY MS. FISHER:

Q    For the record, Mr. Zeni, Gurvey Law Group has documents that Stewart Title Guaranty Company signed off on and reviewed prior to going under an agreement or contract, whatever you want to call, as an affiliate office that says specifically Gurvey Law Group is not responsible for these title policies. It's Stewart Title Guaranty Company.

MS. PROCTOR: Again, Paula, it is improper for the questioning Plaintiff to testify. We're here to get Stewart Title Guaranty Company's corporate rep deposition. If you have questions, now is the time to ask them, but I have to, again, request that you stop testifying.

MS. FISHER: Understood.

MS. PROCTOR: Further, to the extent you claim these documents exist, you have not produced them to us as required by our document request in your initial disclosure requirements. So if you're going to rely on these documents, show them to the witness and produce them in the litigation.

MS. FISHER: Did you get the next set

Eric Zeni
February 17, 2026

Page 170

of exhibits, Mandy?

MS. PROCTOR:  Yeah.  We are at --
Exhibit 9?

MS. FISHER:  Yeah.

(Whereupon a document was identified
as Plaintiff's Exhibit 9.)

BY MS. FISHER:

Q    This is Bates range 610.  I put the
asterisk there.  Can you confirm, for the record,
Jessica Hobirk stated that "We will profit split
with her after the sale...we will list in August for
$1.7 million"?

A    No.  I don't know who authored that.
The name Jessica Hobirk is there.  Otherwise, the
document speaks for itself.

MS. FISHER:  Mandy, can you scroll up,
please?

MS. PROCTOR:  You mean scroll down?
I'm at the top of the --

MS. FISHER:  Yeah.  For the record,
Bates range page 598, 599, they posted about my
home.  597, 580.

(Whereupon a document was identified
as Plaintiff's Exhibit 10.)

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 171

Q     Then we go to Exhibit 10.  Exhibit 10 is an addendum that specifically states remaining proceeds will be split between the buyer and seller after renovation.  Can you confirm that?

MS. PROCTOR:  Object to the form.  Outside the scope.

THE WITNESS:  Again, that's what the document says.

BY MS. FISHER:

Q     Thank you.

(Whereupon a document was identified as Plaintiff's Exhibit 11.)

MS. FISHER:  Can we go -- scroll up to Exhibit 11, please, Mandy?

BY MS. FISHER:

Q     This was provided by Stewart Title Company's discovery, 563 Bates range, on September 17, 2024, when it was printed out, and it's the Fulton County Tax Assessor showing the home was estimated at 1.354 million; correct?  If you scroll up, it's on the second page.  Could you please confirm that?

MS. PROCTOR:  Yeah.  I'm just going to object to the form.  I think you said Stewart Title Company's discovery.  We're talking about Stewart --

Eric Zeni
February 17, 2026

Page 172

MS. FISHER:  No, Stewart Title -- sorry, Stewart Title Guaranty Company's discovery, and it's Bates range page 563 and 564.

MS. PROCTOR:  And I'm also going to object to Plaintiff editorializing the meaning of the date at the top left-hand corner.  Subject to those objections, he can answer.  Oh, and it's outside the scope.  Subject to those objections, he can answer.

THE WITNESS:  You drew an arrow next to Total value, 1.3 mil.

BY MS. FISHER:

Q    **The value of the home in 2024; correct? That's what the tax assessor has it valued at?**

MS. PROCTOR:  Object to the form.  He's not here to testify on behalf of the tax assessor.

THE WITNESS:  Yeah.  I -- I guess so. That's what it says.

MS. FISHER:  Mandy, I'm not asking him to testify on behalf of the tax assessor.  This was in Stewart Title Guaranty Company's possession, so I'm asking about the documents that Stewart Title Guaranty provided to me.

MS. PROCTOR:  You asked if that was the amount that the tax assessor valued the property at.

Case 1:25-cv-01001-VMC-JEM    Document 127    Filed 04/28/26    Page 199 of 222

Eric Zeni
February 17, 2026

Page 173

He's not in a position to speak on behalf of the tax assessor.  My objection is noted for the record.

(Whereupon a document was identified as Plaintiff's Exhibit 13.)

MS. FISHER:  Okay.  I'm going to send you Exhibit 13.  Did it come through?

MS. PROCTOR:  Not yet.

MS. FISHER:  Kate, are you notating exhibits for the record?

THE COURT REPORTER:  Anything that you refer to that has been marked, as well as a parenthetical that will say where it's been identified for the index.

MS. FISHER:  Thank you.

MS. PROCTOR:  Paula, the exhibit is up.

MS. FISHER:  Thank you so much.

BY MS. FISHER:

Q    Okay.  Mr. Zeni, by September 2024, Stewart Title Guaranty Company possessed a title search, an update, reflecting the chain of title and foreclosure activity; correct?

MS. PROCTOR:  Object to the form. Assumes facts not in evidence.

THE WITNESS:  Wrong.  This would be something in Gurvey Law Group's possession.  It was

www.lexitaslegal.com
(800) 676-2401

Eric Zeni
February 17, 2026

Page 174

not turned over to STGC until it was requested by
STGC, and STGC requested Gurvey's file following
receipt of the claim.

BY MS. FISHER:

Q    Do you know approximately what month
that was and year?

A    Not off the top of my head, but I'm
sure there is documentation that would answer that
question.

Q    Can you give me a guess, like your best
guess?

A    No, I'm not going to guess.

Q    And after receiving this packet,
Stewart Title Guaranty Company still did not
initiate a curative action plan to correct the
vested owner problem?  This was dated September of
2024, almost 18 months ago.

MS. PROCTOR:  Object to the form.
Assumes facts not in evidence.  Vague as to vested
owner issue and corrective action terminology.

THE WITNESS:  As I said earlier, STGC
has no duty to do any sort of curative action.  Your
claim was denied, you're not our insured, and this
claim would not be covered if it were submitted by
the insured.

Eric Zeni
February 17, 2026

Page 175

BY MS. FISHER:

Q    But Stewart Title Guaranty Company possessed this packet before you wrote, in December of 2024, the letter and before your January in 2025 letter to the OCI?

MS. PROCTOR:  Object to the form. Assumes facts not in evidence.

BY MS. FISHER:

Q    If you look at -- scroll up, Bates range page 502, the United States Patriot Name Search, that does go on a preliminary title report, as such in this one that's dated September 17, it's targeting Catalyst REI.

MS. PROCTOR:  Object to the form.

THE WITNESS:  So is seems like you read everything here except where it says, "Certified to the Gurvey Law Group, PC."  This was not requested or generated by STGC.  This was in Gurvey's possession until it was turned over to STGC at some point following receipt of your claim.

This is not an STGC document.  It was received by Gurvey Law Group.  I don't know, as I said earlier, what date STGC came into possession of this.  So to your point about whether or not we had this, when I drafted my response to the department

Eric Zeni
February 17, 2026

Page 176

of insurance, I can't answer that.

If you have a document that shows when STGC received this, show it to me. If not, it must be in the claim file somewhere, but I don't know, off the top of my head, when we received this or if I was -- if we had this in our file when I drafted the response to the DOI.

BY MS. FISHER:

Q    Can you find out?  Can you confirm when this was given to you by Gurvey Law Group?

MS. PROCTOR:  Yes, we can do that. It's in the information provided, Paula.  We can talk offline about it.

MS. FISHER:  Thank you so much.

BY MS. FISHER:

Q    Because, from my understanding, it was given to Stewart Title Guaranty Company immediately. So if that's incorrect, I would like that clarified from Stewart Title Guaranty Company's side because, specifically, in your January 21, 2025, letter, you wrote, "The Rebuttal's central (and faulty) premise is that fraud has not occurred" [sic] -- and that fraud has not been established.

So this title search contradicts that.

A    I don't think that's true.

Eric Zeni
February 17, 2026

Page 177

Q    And you know what?  I believe you.  So I would very much like to know when Gurvey gave this to you.

MS. FISHER:  Okay.  Could you scroll up, Mandy, please?  I'm sorry, down to Bates page 507.

BY MS. FISHER:

Q    This is the Deed Under Power.  Right here, the scribbles on the right of the margin, do you know who audited this report, sir?  Was that the Gurvey Law Group or someone at Stewart Title Guaranty Company?  And, again, I got this -- these are not -- for the record, so the record is very clear, these were not scribbles done by me.

MS. PROCTOR:  Object to the form and the characterization of the scribbles as [audio distortion] for auditing.  If he has any information, he can answer.

THE WITNESS:  I don't know what you mean by "audit."

BY MS. FISHER:

Q    On the side where it says 5, where it has 6, where it says 7, it shows the deed is open.  Then if you go down one more to Bates range page 527, up in the left-hand corner where it's audited,

Eric Zeni
February 17, 2026

Page 178

"FYI."

MS. PROCTOR:  I don't know that --

MS. FISHER:  Yeah, right there.  Right there, up on the left.

MS. PROCTOR:  For the record, we're talking about STGC Bates No. 527.

MS. FISHER:  Yes, ma'am.

BY MS. FISHER:

Q     It says "FYI.  Out by deed under power," DUP, Deed Under Power.  And then if you scroll down to the next page, Bates range 528, and, again, this wasn't done in September of 2024.  Go to the next page.  It's circled.

This was the original case, Mr. Zeni, in the lower state court, and it's circled open.  So somebody actively reviewed this, and they knew exactly what was going on.  And I want to know who was it that went through this report and reviewed it and knew about all this 18 months ago?  Do you have any idea, sir?

MS. PROCTOR:  I'm going to object again because of the testifying Plaintiff here and the mischaracterization of the document.  The question is vague, ambiguous, and assumes facts not in evidence.

Eric Zeni
February 17, 2026

Page 179

THE WITNESS:  Is there a face page to this?  What are we looking at?  I see a bunch of individual documents.

BY MS. FISHER:

Q    Yes.  If you go to the Bates range -- the first part, 495, is the very first page.

MS. PROCTOR:  There are missing --

BY MS. FISHER:

Q    **Traditional Title Services. Thursday, September 19, it has my address, the order number.**

MS. PROCTOR:  For the record, the document marked as Exhibit 13 is missing Bates numbered pages.  We go from 495 into 496, 497, and --

MS. FISHER:  Yes.

MS. PROCTOR:  -- then it skips to 502.

MS. FISHER:  I only picked out the pieces that were marked or relevant because the report was very extensive.  But, again, it was in the production.  It's almost 30 -- I want to say it's almost 45 -- it's 44 pages, to be exact, Bates range 495 to 544.

MS. PROCTOR:  I don't want to testify for the witness, but because this exhibit has cherry-picked pages out of the production, I want to

Eric Zeni
February 17, 2026

Page 180

say all of these documents are from Gurvey Law Group's file, like the witness testified to. And, I said, we can get you the date we received these documents.

MS. FISHER: Okay.

BY MS. FISHER:

Q    But my question is very specific: Do you know who audited and made these markings and acknowledged certain things on this report, such as the lower state Statement Court open, the deed under power?

A    So, as counsel said, this jumps around a lot, but it looks like this is probably the contents of Gurvey's title search or title commitment, perhaps. I don't know. This is something from Gurvey Law Group. It's not generated or marked by STGC, so --

Q    Thank you.

A    -- I don't know who marked it.

Q    You answered my question. Thank you.

MS. FISHER: Okay. Now, Mandy, I'm going to send you --

MS. PROCTOR: Are we done with this exhibit?

MS. FISHER: Yes, ma'am.

Eric Zeni
February 17, 2026

Page 181

(Whereupon documents were identified as Plaintiff's Exhibit 14 and Plaintiff's Exhibit 15.)

MS. FISHER:  Okay.  I'm sending you, Exhibit 14, which is the warranty deed, and I've sent you, in a separate email, Exhibit 15, the State of Florida certificate.

MS. PROCTOR:  I received the warranty deed.  I'm going to throw it up on the screen now.

MS. FISHER:  Thank you.

BY MS. FISHER:

Q    Mr. Zeni, can you please confirm if you have or have not seen this warranty deed?

A    I believe I have.  It was our document production.

Q    Thank you.

MS. FISHER:  Mandy, could you ahead and throw up Exhibit 15, please?

MS. PROCTOR:  Sure.

BY MS. FISHER:

Q    And the warranty deed, to be clear for the record, states Catalyst REI, LLC; correct?

A    Yes.

MS. FISHER:  Can you now throw up Exhibit 15?  And thank you for doing this.

Eric Zeni
February 17, 2026

Page 182

MS. PROCTOR:  My pleasure.

BY MS. FISHER:

Q      Okay.  Mr. Zeni, this is a certified copy of a document I got from the State of Florida. Could you please confirm what it says?

A      Do I have to read it for you?

Q      No.  You can just confirm it.  I can read it, if you'd like.  It says, "I certify that the records of this office do not disclose a limited liability company by the name of Catalyst REI, LLC, active or dissolved," signed by Cord Byrd, Secretary of State of the State of Florida.

When I called and asked them specifically if the entity was ever in existence, they said that it never existed in the state of Florida.  Therefore, that's why they concluded it was never active or dissolved.  Can you confirm that this is what this says?

MS. PROCTOR:  I'm going to object to the testifying of Plaintiff in her questions.  I'm also going to object to the form of the question.

THE WITNESS:  I think the document speaks for itself, and you just read it.

BY MS. FISHER:

Q      So could you -- can we agree that the

Eric Zeni
February 17, 2026

Page 183

Catalyst REI, LLC, never was in existence?

MS. PROCTOR:  Object to the form calls for speculation.

THE WITNESS:  No.  I don't think that's what it says.  It says they have not located such records for such an LLC.

BY MS. FISHER:

Q    And what does that mean, if they can't locate -- to you, what is your understanding, if the State can't locate a record?

MS. PROCTOR:  Object to form.  Calls for speculation about what the secretary of state for the state of Florida meant in this document.

MS. FISHER:  I'm just asking what Mr. Zeni's testimony, what he meant by that.

MS. PROCTOR:  I'm preserving my objection for the record.

THE WITNESS:  To me, it means they can't find a record, whether or not there is such an LLC.  I don't know how far they searched.  I don't know how far the records go back.  I don't know.  You would have to ask the State of Florida.

BY MS. FISHER:

Q    All right.  Thank you.

MS. FISHER:  Okay.  It's 3:25.  Can we

Eric Zeni
February 17, 2026

Page 184

take a five-minute break?

MS. GILROY:  Paula, how much more do you think you have?

MS. FISHER:  I think really like a half hour, 45 minutes.

MS. GILROY:  That's great.

MS. FISHER:  Do we have to get off at a certain time?

MS. PROCTOR:  We would --

MS. GILROY:  I will at 5:00.

MS. FISHER:  Oh, we'll be done by then.

MS. GILROY:  But, hopefully, we'll be done before then.

MS. FISHER:  Yeah, we'll be done.

MS. GILROY:  Ideally, I'd love 4:15, but it's okay.

MS. PROCTOR:  If we're putting in requests, I would really like 4:30 so Eric can get ahead of rush hour traffic or 4:15.

MS. FISHER:  Well, let's take a five-minute break, and let's see how fast we can get through the next set.

(Proceedings in recess from 3:26 p.m. to 3:37 p.m.)

BY MS. FISHER:

Eric Zeni
February 17, 2026

Page 185

Q    Mr. Zeni, thank you for taking the time out to fly down to Atlanta and do this deposition. Before we finish, I just want to make a clear record of your preparation for today's deposition, since we didn't at the beginning.  I am not asking for any attorney-client communications or legal advice.  I'm asking only what documents you reviewed or what categories of documents you reviewed to prepare to testify as Stewart Title Guaranty's Rule 30(b)(6) witness.  Do you understand?

A    Yes.

Q    Thank you.  Other than any exhibits we marked today, could you please list and tell me every category of documents you reviewed to prepare for today?  Like, for an example, the claim file, those kind of things.

A    Sure.  I reviewed our claim file, the files for the responses to the insurance department complaints, and the over-limits file.

Q    Did you review the first amended complaint in this case, in preparation for this today?

A    No.

Q    Did you review the original complaint in preparation for today?

Eric Zeni
February 17, 2026

Page 186

A    No.

Q    Did you review any motion practice relating to amendment of the pleadings, including any motion for leave to amended or any proposed amended pleadings filed in this case?

A    No.

Q    Did you review any declarations submitted by Stewart Title Guaranty Company in this case, in preparation for today?

A    No.

Q    Did you review any meet-and-confer correspondence or written position statements sent by Stewart Title Guaranty Company attorneys regarding --

MS. PROCTOR:  Objection.

BY MS. FISHER:

Q    -- discovery or depositions in this case?

A    No.  The only thing I reviewed regarding deposition was my -- the 30(b)(6) notice and Counsel's January 19, 2026, letter to you.

Q    So you never got any emails or any correspondence on any meet-and-confer correspondence regarding discovery?

MS. PROCTOR:  Objection.  Misstates his

Eric Zeni
February 17, 2026

Page 187

testimony.

THE WITNESS:  No.  I didn't review any meet-and-confer.

BY MS. FISHER:

Q      Okay.

A      Like I said, all I reviewed was my 30(b)(6) notice and my counsel's letter to you regarding [audio distortion].

Q      Thank you.  Did you review Stewart Title Guaranty Company's interrogatory responses served in this case, in preparation for today?

A      Yeah, I think so.

Q      Did you review Stewart Title Guaranty's responses to request for production served in this case in preparation for today?

A      Yes.

Q      Did you review Stewart Title Guaranty's responses to request for admissions served in this case, in preparation for today?

A      I don't recall specifically.

Q      Did you review any Stewart Title Guaranty's policies, procedures, guidelines relating to claim handling, underwriting, verification in preparation for today?

MS. PROCTOR:  Object to form.  Vague as

Eric Zeni
February 17, 2026

Page 188

to verification, and also outside the scope.

THE WITNESS:  No.  I don't recall.

BY MS. FISHER:

Q      Did you review any materials regarding ALTA best practices or Stewart compliance procedures in preparation for today?

MS. PROCTOR:  Objection to the form and outside the scope.

THE WITNESS:  I don't recall that.

BY MS. FISHER:

Q      Mr. Zeni, are you very familiar with ALTA best practices?

MS. PROCTOR:  Objection.  Outside the scope and object to the form.

THE WITNESS:  I don't know what you're referring to by ALTA best practices.

BY MS. FISHER:

Q      Mr. Zeni, as we sit here right now, is your testimony that you were fully prepared today to testify on Stewart Title Guaranty Company's behalf?

A      As to the matters outlined in my counsel's January 19, 2026, letter to you, yes.

MS. FISHER:  Thank you so much.  That's all I have.

MS. PROCTOR:  Great.  I just have just

Eric Zeni
February 17, 2026

Page 189

a few --

MS. GILROY:  Thank you, Paula.

MS. PROCTOR:  I just have just a few follow-up questions.  Monica, do you have any questions before I get started?

MS. GILROY:  No, I do not, Mandy.  Thank you.

EXAMINATION

BY MS. PROCTOR:

Q     All right.  Mr. Zeni, I just want to go back.  I have a few questions.

MS. FISHER:  Do you need me to stay on, Mandy?

MS. PROCTOR:  Yes, you should stay on.  We're still on the record.  I just have a few follow-up questions for him, based on some of his prior testimony, but I will be brief.

BY MS. PROCTOR:

Q     All right.  I'm pulling up what Plaintiff has marked as Exhibit 5.  Do you recall Plaintiff asking you questions regarding this exhibit?

A     Yes.

Q     And, specifically, some of the earlier questions concerned a signature here on the right-

Eric Zeni
February 17, 2026

Page 190

hand side of Mr. Frederick H. Eppinger. Do you see that?

A    I do.

Q    And is this document that Plaintiff has marked as Exhibit 5, is this a portion of the policy jacket?

A    It is.

Q    What is a policy jacket?

A    A policy jacket is, basically, the preprinted boiler plate --

MS. FISHER: Okay. I need to interrupt, Amanda. This is the deposition I'm taking of the witness. If you want to take your own deposition of your own client, you can do that at another time.

MS. PROCTOR: Your objection is noted, Paula, but this is standard for me to do redirect.

MS. FISHER: It's not standard, not in a Federal case. It is absolutely not.

MS. PROCTOR: Your objection is noted.

MS. GILROY: Paula, it is. She has every right to do this. She asking nonleading questions. Just let her proceed, and the objection can be noted.

BY MS. PROCTOR:

Eric Zeni
February 17, 2026

Page 191

Q    So if you could please explain, for the record, what is a policy jacket?

A    So the policy jacket is, essentially, the jacket, the front and back of the policy, so to speak.  It's the preprinted form.  It is the boilerplate of the policy.  It's -- you know, as it's noted, it's typically promulgated by ALTA, the basic form of policy containing covered risks.  In this case, we're looking at an owner's policy, which has its own covered risks; standards exclusions from coverage, and the different conditions of the policy, including the title company's rights to cure title, if applicable; and also the policy definitions.

Q    And this preprinted policy jacket, is it provided to STGC's issuing agents, like the Gurvey Law group?

A    Yes.

Q    And so my question is:  Is the signature from Mr. Eppinger, is this a preprinted signature, or is it a wet signature on every policy jacket?

A    No.  It's preprinted.  It's a facsimile copy.  The STGC signatures are preprinted on every policy jacket provided to the issuing agents.

Eric Zeni
February 17, 2026

Page 192

MS. PROCTOR:  Those are all the questions --

MS. FISHER:  I have to -- Amanda, this isn't a cross-examination.  I'm going to object to it, and we're going to end the deposition now.  I -- you're trying to get things on the record, and this is something where you can do on your own time in your own deposition.

MS. PROCTOR:  I'm finished with my questions, Paula, but your objection is noted for the record.  Before we sign off, Kate, we would like to read and sign the deposition transcript.

MS. FISHER:  That's what you can do, but you cannot cross-examine the deposee.  This --

MS. PROCTOR:  You're right.  I can redirect.  I didn't cross-examine.  I redirected, and that is completely proper.  You can take that up with the judge, if you disagree.

MS. FISHER:  So this concludes the deposition.  Thank you.

THE COURT REPORTER:  Did anyone want to order the transcript?

MS. FISHER:  I am.

MS. PROCTOR:  We would like -- I would, on behalf of Stewart Title Guaranty Company.  E-tran

Eric Zeni
February 17, 2026

is fine and PDF.

MS. GILROY:  Yes.  And on behalf of Stewart Title Company, yes, an e-tran with the exhibits please.

(Deposition concluded, 3:49 p.m.)

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness has been reserved.)

Eric Zeni
February 17, 2026

Page 194

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

4794-3874-7305-1643

Kate McKee, CCR, 4791-3874-7305-1648

Eric Zeni
February 17, 2026

Page 195

DISCLOSURE OF NO CONTRACT

I, Kate McKee, Certified Court Reporter, do hereby disclose pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that I am a Georgia Certified Court Reporter; I was contacted by the party taking the deposition to provide court reporting services of this deposition; I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-27(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c).

There is no contract to provide reporting services between myself or any person with whom I have a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond my usual and customary rates have been disclosed and offered to all parties.

4794-3874-7305-1643

_____

Kate McKee, CCR, 4791-3874-7305-1648

DATE:   March 9, 2026

Eric Zeni
February 17, 2026

Page 196

Paula Fisher v. Stewart Title Company

The preceding deposition was taken in the matter, on the date and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition.

Said jurat is to be returned within 30 days following receipt of the transcript to the following address:

Lexitas
1551 Forum Place, Suite 200-E
West Palm Beach, FL 33401